**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MEGHAN E. KLEIN, individually and in her
capacity as Executrix of the ESTATE OF
MICHAEL P. DONATUCCI,
629 Swedesford Road
Malvern, PA 19355
                              *Plaintiffs*,

*vs.*

RONALD R. DONATUCCI, SR., ESQUIRE,
individually and in his capacity as
REGISTER OF WILLS OF THE CITY OF
PHILADELPHIA and CLERK OF THE
ORPHANS' COURT DIVISION OF THE
COURT OF COMMON PLEAS OF
PHILADELPHIA,
Room 180, City Hall
Philadelphia, PA 19107; and

STEPHANIE DONATUCCI
104 Queen Street
Philadelphia, PA 19147; and

RONALD R. DONATUCCI, JR.
3515 Capri Court
Philadelphia, PA 19145; and

RONALD, MICHAEL and RONALD, LP
104 Queen Street
Philadelphia, PA 19147; and

RRM ASSOCIATES, LLC
104 Queen Street
Philadelphia, PA 19147; and

RONALD and ROBERT DONATUCCI, LP
104 Queen Street
Philadelphia, PA 19147; and

WILMINGTON SAVINGS FUND
SOCIETY, FSB
1 West Lancaster Avenue
Paoli, PA 19301; and

CIVIL ACTION

NO. 2:19-cv-01364-PBT

AMENDED COMPLAINT

JURY TRIAL DEMANDED

1

DEBRA J. FOGLIETTA
1402 E. Moyamensing Avenue, Unit 3
Philadelphia, PA 19147; and

JAMES F. MANNION, ESQUIRE
1755 Thistle Way
Malvern, PA 19355; and

MANNION PRIOR, LLP
840 First Avenue, Suite 100
King of Prussia, PA 19406-1459; and

FRANK DeSIMONE, ESQUIRE
123 S. Broad Street, Suite 2500
Philadelphia, PA 19109; and

BRIMFIELD CAPITAL, LLC
45 Brimfield Road
Audubon, PA 19403; and

HAU-KAY T. SIU
45 Brimfield Road
Audubon, PA 19403
                                    *Defendants*

Plaintiff Meghan E. Klein, individually, and in her capacity as the Executrix of the Estate

of Michael P. Donatucci, deceased, respectfully submits this Amended Complaint and alleges as

follows:

## INTRODUCTION

1.      This is a civil rights action, with pendant state claims, to recover for the continuing

abuse of power by Defendant Ronald R. Donatucci, Sr., the Register of Wills of Philadelphia and

Clerk of the Orphans' Court Division of the Court of Common Pleas of Philadelphia

("Donatucci").  Donatucci is using—misusing—the power of his office to attempt to conceal

circumstances surrounding his son's passing and to wrest control of valuable property and other

financial benefits from Plaintiff, Meghan E. Klein ("Meghan"), the young and vulnerable fiancée

of Donatucci's son, Michael, who died on July 15, 2016, two months before he and Meghan were to be married.  Meghan is the Executrix and primary beneficiary of Michael's estate (the "Estate").

2.      While this case involves an Estate, it is anything but a "personal dispute" over its administration; in fact, none of Meghan's inheritance (including property interests in the real estate she has inherited from Michael) is disputed.  Rather, at the heart of this case is the Register of Wills' gross abuse of one of the central functions of his Office—the probate process, which he has been able to use as a personal shield and weapon against his son's fiancée in pursuit of his own interests, including significantly *to cover up circumstances surrounding his son's death on July 15, 2016* and to scheme and take control of Meghan's inherited property interests with the aim of his personal enrichment.  Donatucci has been able to carry out his scheme as a direct result of the power and control he has amassed by virtue of the extraordinary patronage empire he has been able to build through his official position as Register of Wills and Clerk of the Orphans' Court.

3.      The circumstances of this case may appear unique and perhaps not typical of a class of one equal protection claim, but a closer look reveals they are actually no different than those frequently before this and other Federal Courts.

4.      Donatucci did not treat Meghan like he does the hundreds of thousands of individuals who come to his office year after year to probate their loved ones' Estates.  Rather, Donatucci singled Meghan out and treated her differently, deliberately discriminating against her and relentlessly violating her constitutional rights for an irrational purpose, i.e., to pursue his own interests.

5.      Just as in the more typical case of police brutality, in which an officer abuses his/her authority on the job by singling out an individual through excessive force resulting in injury, Donatucci, cloaked in the power of his Office which he has held for 39 years, has singled out the

3

Executrix, the fiancée of his late son's Estate using his authority to intimidate, harass, and abuse her causing her both financial and emotional harm. Donatucci has not acted alone, as he has directed his subordinate City employees, and others within the business and legal community in the City of Philadelphia ("City") who benefit from his power and influence, to do his bidding and execute his plan to take control of his late son's Estate, contrary to his son's wishes and to the detriment of Michael's fiancée.

6.     Significantly, despite urging and making arrangements with Meghan to probate Michael's Will (which Meghan requested occur at Donatucci's office, rather than at her home in Montgomery County as Donatucci preferred) and despite raising no objections of any kind before or at the probate, within just days of Donatucci's probating his son's Will on August 11, 2016, on August 31, 2016 Donatucci threatened to contest his son's Will if the Executrix did not comply with his various demands. After harassing the Estate over the course of a year in an attempt to force Meghan to succumb to those demands outside of court, he would ultimately go on to file a Will Contest (in conjunction with a petition to replace Meghan as executor with himself), but only as a last-resort extortion tactic.  Once the Court caught onto Donatucci's games, and in an attempt to avoid turning over Michael's cell phone and other information he took to conceal his involvement in what occurred on July 15, 2016, Donatucci withdrew his baseless threat.

7.     While the probate in and of itself is not a discriminatory act—in fact on face value it was proper—it was Donatucci's *failing to respect his decision and his actions taken, including his misuse of state power, to deliberately undermine that decision*, that gives rise to Plaintiffs' claims in this case.

8.     Donatucci's admitting Michael's Will to probate signified to Meghan, as it would to any other individual who comes to Donatucci's office to probate a will and takes an oath to

4

faithfully discharge the duties of a personal representative, that Donatucci acknowledged she had full authority to carry out her fiancé's Estate, which she of course then set out to do. However, Donatucci's actions ran counter to his decision and the authority he specifically bestowed upon her by virtue of such decision.

9.      As was later learned, the probate in this case, unlike those of other individuals (and even his family members) that come before him, was not genuinely intended (or recognized) by Donatucci to confer authority, but was rather only a part of an elaborate scheme concocted through his Office aimed at *taking that authority (and the assets of his son's Estate) from Meghan* through subversive and illegitimate means for his own benefit. Donatucci not only enacted this scheme to attempt to take the valuable property and other financial benefits from his son's Estate, but the scheme also allowed him to conceal information regarding his son's assets and, significantly, the circumstances of his son's death.

10.      As shown below, Donatucci's Will Contest was nothing but an attempt to extort Meghan—not only did it have no basis (in fact Donatucci even boasted of Michael's performance as CIO of the Philadelphia Pension Fund on the day of his passing), but Donatucci was not a beneficiary under Michael's probated Will (or his alleged prior will) and so he actually lacked the standing necessary to bring such a challenge. Donatuci knew this and so he took measures to avoid negative publicity over his improper filing by actually blocking public access to the Court's electronic docket system, which he is responsible for maintaining. In fact, Donatucci also arranged for a publicist he employs via the Philadelphia Board of City Trusts, Kevin Feeley of Bellevue PR, to assist him in avoiding such negative publicity.

11.      Donatucci, who has a history of abusing his Office and has been using his Office to wage his own personal war against the Estate of his late son *for the past three years*, now claims

that he was acting in his individual capacity, *not* as Register of Wills, when he threatened his Will Contest and later filed it, and that he was acting in his individual capacity when he—and other City employees at his direction—took a number of other actions to intimidate, harass, and threaten the Executrix in various ways.

12.     His belated attempt to create this distinction between himself as an individual and as Register, as if actual boundaries exist, is without any basis.  No such boundary exists, nor has it for Donatucci's nearly four decades in office and in fact Donatucci has directly benefited personally from blurring those very lines, in spite of concerns from the public and other agencies looking to root out corruption in City government.

13.     One of the primary functions of Donatucci's role as Register is to hear testimony concerning challenges to Wills in order to make a determination to accept or reject a will for probate.  Presumably, Donatucci put the same thought, if not more, into the probate of his late son's Estate.  In fact, it appears significant thought went into the probate, as it has been revealed that Donatucci actually consulted with *two* probate and estates attorneys employed by the Donatucci's Office and the Board of City Trusts *before* he made his decision to accept his son's Will as valid.

14.     Not only did Donatucci learn nothing new in the short time between the probate and his first threat to contest, but he also learned nothing new prior to filing his Will Contest, or even later before withdrawing it.  At all times he was fully equipped with all the knowledge he needed to make his decision.  Had he not been equipped with the necessary knowledge or had any legitimate doubts or reasons to contest, presumably he would not have probated the Will.  At a minimum, he would have at least recused himself, or issued an informal or formal caveat. Those

steps (all of which would have required discovery to occur up front) were not taken, and in fact Donatucci himself requested Meghan probate Michael's Will.

15.     Rather, based on information and belief, because Donatucci wished to gain control of his late son's Estate (including both his assets and information) but had no valid basis to contest (or standing for that matter), Donatucci, together with the two probate and estates attorneys, as well as Charles M. Golden, Esquire, Solicitor to his Register of Wills' Office ("Golden"), concocted a scheme in which they determined that probating the Will with the threat of a will contest, among other intimidation tactics, would be the most effective way—if not the only way— to achieve Donatucci's desired result.  Donatucci is used to operating this way, and he has gotten away with it for years.

16.     Donatucci carried out his plan thanks to a unique benefit the office of the Register of Wills afforded him:  the ability to engage in patronage hiring.  Unlike other Philadelphia City offices, the nearly 80 employees of the Register of Wills' Office are not part of the City government's civil service system.  Rather, they are hired by Donatucci and serve at his pleasure. Many are ward leaders, committee members, friends, family members and political allies, all of whom help "grease the political machine." Donatucci has held the Register of Wills' position for nearly forty years, in the course of which he has openly used patronage hiring to create an empire of individuals inside and outside of government who owe him loyalty and favors.  Donatucci is not shy about collecting.

17.     Upon learning of Michael's tragic death, Donatucci immediately began scheming to gain control of the Estate and its valuable real estate interests (as well as information), including those that Meghan stood to inherit under Michael's Will.  Donatucci would do whatever it took to achieve those goals.

18.     Based on information recently uncovered, it appears Donatucci actually lied to authorities to advance his scheme.  It was *Donatucci*—not Meghan—who initially discovered Michael was dead, following Donatucci's receipt of a text message Michael sent to him in the afternoon on July 15, 2016 (allegedly just moments prior to Michael's apparent suicide in the apartment he shared with his fiancée) in which he asked his father to come find him so that Meghan would not.  Rather than contacting authorities, Donatucci allowed Michael's body to lie in the apartment for hours until Meghan arrived home from work that evening to find Michael.  It was Meghan who called 911.  Donatucci led the authorities and everyone else to believe that he learned of his son's death *only* once Meghan found him that evening.

19.     On July 15, 2016, in the hours after Michael's apparent suicide, Donatucci directed the removal and replacement of police officers of the Philadelphia Police Department who were investigating Michael's death at the apartment (which is one of two apartments in a carriage house adjoined to Donatucci's home, bearing separate addresses, in the Queen Village section of South Philadelphia) with City employees, including from his Register of Wills' Office and police officers friendly to Donatucci.

20.     In doing so, Donatucci was able to successfully interfere with what would have otherwise been a typical (thorough) crime scene investigation of a violent sudden death. As the scant police report shows, Donatucci was able to conceal circumstances surrounding his son's death, including significantly his finding Michael earlier that day.  In addition, that day (likely even earlier in the day upon his finding Michael) and in the days that followed, Donatucci and these City employees from his office, at Donatucci's direction, were able to get away with unlawfully removing belongings of Michael and Meghan from their apartment and changing the locks on the apartment, refusing to give Meghan a new set of keys.  Among other things, they took

Michael's cellphone, Will, laptop, USB flash drives, and files, as well as control of Michael's email accounts, initially through his phone (ultimately changing Michael's passwords to block Meghan from access). These devices and things were taken to prevent Meghan from obtaining information regarding the circumstances of Michael's death, including Donatucci's knowledge of Michael's death earlier that day, as well as information relevant to the business disputes between Michael and his father, Donatucci, and his brother, Ronald R. Donatucci, Jr. ("Donatucci, Jr."), and now between the latter two and Meghan, as Executrix and beneficiary.

21.     Donatucci's bizarre actions on the day of his son's passing and in the days and now years that followed, including, perhaps most jarringly, the great lengths to which he has gone to attempt to cover-up the circumstances surrounding his son's passing, which occurred just a month and a half into his new job with the City's Pension Fund, beg the question – what is it that Donatucci is really hiding?

22.     Though a number of questions remain unanswered, one thing is for certain: this is without a doubt a story rooted, at least in part if not entirely, by greed.

23.     Donatucci did not want Meghan to see Michael's Will, which appointed her executrix and made her the principal beneficiary of his estate, and so he hid it from her in the days following Michael's passing, as she later came to learn. Unfortunately for Donatucci, it appears Michael was one step ahead of him—*Michael had set up prior to his death an email, with his Will attached, via a program called boomerang to send after his death (including to Meghan and his mother who was living in California at the time of his death).* Michael evidently took such measures in anticipation of such behavior from his father and brother. Michael wanted to make sure his Will ended up in the right hands. Sadly, despite Michael's efforts, Donatucci still showed no respect for his son's final wishes.

24.     To achieve his goals, Donatucci engaged in a pattern of bullying and intimidating conduct against Meghan, personally and through surrogates beholden to him by virtue of his office (including his solicitor at the Register of Wills' Office, Charles Golden, Esq., and probate and estates attorneys that his Office and the City's Board of City Trusts employs, Eugene Gillin, Esq. and James F. Mannion, Esq.), through which he sought to enrich himself and his surviving son, Donatucci, Jr., by taking control and ownership of Michael's real estate interests, among other things. As elaborated below, Donatucci was especially interested in a valuable property referred to below as the Girard Avenue Property.   Donatucci even pulled in the mortgage lender, Wilmington Savings Fund Society, FSB, with which, on information and belief, the City and Donatucci's Office and personal businesses have substantial relationships, to help facilitate his plan to obtain the property at a fraction of its market price.

25.     In another example, Donatucci used a former FBI agent, Dave Gentile, to threaten Meghan's then-counsel, the Philadelphia law firm Conrad O'Brien, P.C. (the "Conrad Firm"), which resulted in the Conrad Firm withdrawing as counsel to Meghan and the Estate in various state court litigations between Meghan and Donatucci.  The threat to the Conrad Firm was simple – stop representing Meghan or you will be punished by the Donatucci political machine. It worked.

26.     The fact is that Donatucci could deliver on his threat and the Firm knew that. Such a threat would carry no weight for the average person—but for Donatucci, cloaked in the power that his Office has afforded him, influencing the Philadelphia courts against the Conrad Firm was a real possibility.   Donatucci interacts with the court system regularly and wields substantial influence through his official positions with the City, including through the judges he helps get elected.

27.     This has been the unfortunate pattern that has unfolded over the past three years: a deliberate and conniving pattern of abuse by Donatucci to conceal information and relentlessly challenge his son's Will, in spite of his own judicial decision to accept the Will for probate.

28.     Donatucci, who has become infamous for not only abusing his office, but also loopholes in City government, to benefit and advance himself personally, effectively tried to get away with more of the same abuse here.

29.     In using his Office to amass power and wealth for himself, his interests come first, the well-being of the City only second.  Reports of Donatucci's conduct over the years, dating back to the early 90s, is evidence of that.  He has certainly had his fair share of scandals: he is notorious for his rampant self-touted patronage, which despite fostering corruption he claims "works"; he infamously exploited the City's Deferred Retirement Option Plan ("DROP") which he used to retire for one day, cash in on a $370,000 pension check, and keep his position (despite his irrevocable agreement to retire); he paid off a political opponent to not run against him, with City (patronage) jobs in his Office; he is reportedly hardly ever in his Office and actually is known to use his employees to conduct his personal business from inside and outside his Office on City time; he has repeatedly objected to requests for transparency into his Office (including blocking public records requests through his Solicitor, Charles Golden, Esq.); and, he refuses to consider (or heed the advice from) reports of the Committee of Seventy and the Philadelphia Inquirer suggesting (and even quantifying) that his ways are costing the City money and hurting the public perception of his Office.  In fact, recently it was reported in news media that an independent investigation of the Pennsylvania Auditor General revealed that approximately $150,000 of funds was missing from Donatucci's Office. The Pennsylvania Auditor General found a number of material weaknesses as a deficiency in internal controls in Donatucci's Office, in his capacity as

Register of Wills and Clerk of the Orphans' Court, and noted that the deficiencies "created an environment that is conducive to fraud."

30.     Donatucci was also voted out of Office this year and is now unabashedly attempting to unionize his Office, so that the City's next Register of Wills cannot be afforded the same opportunity to hire and fire employees that Donatucci had for nearly 40 years. Linn Washington, a professor of journalism at Temple University, reportedly noted that this attempt to unionize the Office is "suspicious" in view of the fact that the employees were content to remain at-will for decades under Donatucci.

31.     The probate process and will contests were created and are intended as a means of validating wills and offering recourse for those with legitimate disputes with a Register's decision. They are absolutely not intended to be used (or threatened) by the Register as a means of extortion and intimidation, as Donatucci, with the assistance of his co-defendants and City employees, has done here.

32.     It is a sad and ugly sight:  one of the most powerful political figures in Philadelphia waging war against a bereaved fiancée.

33.     Donatucci's conduct has not only robbed Meghan of living free from anxiety, fear and mental anguish, but it has robbed her from ever having peace of mind as to the circumstances of her fiancé's death.  Meghan will never know what she could have known had Donatucci *not* interfered with the police's investigation into her fiancé's passing, had Donatucci and his City employees *not* tampered with the contents of Michael's phone, email, and other accounts, and had Donatucci and his City employees *not* invaded her shared apartment with Michael and removed their personal belongings (or similarly removed Michael's personal belongings from his office at the Philadelphia Pension Fund with the assistance of other City employees at the Fund).

34.     Donatucci's conduct has inflicted irreversible emotional harm to Meghan who will be left to forever question the circumstances of her fiancé's tragic passing and what it is that Donatucci and employees of the City's Pension Fund, Register of Wills' Office, and Orphans' Court, and City Trusts are hiding, including why Donatucci let Meghan find Michael (and why he lied about it), why he interfered with and prevented a thorough investigation of his son's death, why he and City employees tampered with Michael's phone and emails (refusing to let Meghan possess, or even see, the phone for over two and a half years), why Donatucci locked Meghan out of her shared apartment with Michael, and why (and what) he removed from their apartment (as well as Michael's office and car).

35.     Donatucci's actions and delays have been deliberately intended to prevent Meghan from being able to obtain the information that he and his other co-conspirators have been hiding. In fact, in the past year, Donatucci, his son Donatucci, Jr., and the Bank all have claimed that they destroyed records (even those proven to have existed) being sought in discovery in litigation in Chester County (discussed *infra*).  His life-long friend, Defendant Frank DeSimone, Esq., and employee, Solicitor Golden, are also involved in withholding records for Donatucci.  Given that it has been three years since the passing of Michael, it is possible the information may no longer be easily found or recovered.  This appears to have been exactly what Donatucci intended.

36.     Meghan has come to this Court to seek relief for the severe and intentionally inflicted emotional distress Donatucci's abuses have caused her, and to prevent further abuses.  In addition to damages and certain injunctive relief, Meghan is also seeking, based on the same facts, a partition of the real estate interests Michael left to Meghan and his mother (and which are owned jointly with Donatucci, and as to which there is no dispute with regard to Meghan and Michael's mother's interest), and recovery on various state law claims.

37.     While a part of some state law claims touch upon certain claims pending in state court, this case involves a far broader conspiracy than currently at issue in the state court litigation (as well as federal claims), which are not before state court.  No partition claim is pending in any other court.  Meghan comes to this Court because her claims cannot be fairly judged in state court in Philadelphia.

## THE PARTIES

38.     Plaintiff Meghan E. Klein brings this action individually and in her capacity as Executrix for the Estate of her deceased fiancé, Michael P. Donatucci, who was serving as the Chief Investment Officer of the City of Philadelphia Board of Pensions at the time of his death. Meghan is a resident of Lafayette Hill, Montgomery County, PA.

39.     Defendant Donatucci is an adult individual, an attorney licensed in Pennsylvania, and an employee of the City of Philadelphia with the official titles of Register of Wills and Clerk of the Orphans' Court.  Donatucci resides in Philadelphia, PA.  Donatucci is/was Michael's father.

40.     Defendant Stephanie Donatucci is an adult individual and the current wife of Donatucci. Stephanie Donatucci resides with Donatucci in Philadelphia, PA.

41.     Defendant Donatucci, Jr. is an adult individual, and an employee of the City of Philadelphia's Board of Licenses and Inspections, who is sued in his individual capacity only. Donatucci, Jr. resides in Philadelphia, PA.  He is Donatucci's son, and is/was Michael's brother.

42.     Defendant Ronald, Michael and Ronald, LP is a limited partnership with its principal place of business in Philadelphia, PA.  Its Limited Partners are Donatucci (33%), Michael (33%), and Donatucci, Jr. (33%).  Its General Partner is Donatucci (1%).

43.     Defendant RRM Associates, LLC is a limited liability company with its principal place of business in Philadelphia, PA.  Its Members are Donatucci (34%), Michael (33%), and Donatucci, Jr. (33%).

44.     Defendant Ronald and Robert Donatucci, LP is a limited partnership with its principal place of business in Philadelphia. Plaintiffs have not been provided information regarding the percentage interests of the limited partners of this entity. (Ronald and Robert Donatucci, LP, RRM Associates, LLC, and Ronald, Michael and Ronald, LP are together referred to herein as the "Real Estate Entities").

45.     Defendant Wilmington Savings Fund Society, FSB ("WSFS" or "Bank") is a federal savings bank, the largest in the Delaware Valley/Philadelphia area, with offices located in Philadelphia and surrounding Pennsylvania counties.  WSFS was the mortgagee on a certain piece of real estate in which Michael had a majority interest through an entity Penn Peak Capital, LLC.

46.     Defendant Debra J. Foglietta ("Foglietta") is an adult individual who at the time of Michael's death resided in California and who presently resides in Philadelphia, PA. Foglietta is Michael's mother and Defendant Donatucci's ex-wife.

47.     Defendant James F. Mannion, Esquire is an adult individual and an attorney licensed in Pennsylvania who is sued in his individual capacity and in his capacity as a partner in Defendant Mannion Prior, LLP.  He maintains his office in King of Prussia, Montgomery County, PA and resides in Malvern, Chester County, PA.

48.     Defendant Mannion Prior, LLP is a law firm with its principal place of business located in King of Prussia, Montgomery County, PA.  James F. Mannion, Esquire and Mannion Prior, LLP are counsel for Donatucci, and they are hereinafter separately or together referred to as "Mannion."

49.     Defendant Frank DeSimone, Esquire ("DeSimone") is an adult individual and an attorney licensed in Pennsylvania.  He maintains his office in Philadelphia and resides in Bryn Mawr, Montgomery County, PA.  DeSimone is counsel for Foglietta.

50.     Defendant Brimfield Capital, LLC ("Brimfield") is a Pennsylvania limited liability company with its principal place of business in Audubon, Montgomery County, PA.

51.     Defendant Hau-Kay T. Siu ("Siu") is an adult individual who resides in Audubon, Montgomery County, PA.  Upon information and belief, Siu and his wife, non-party Katy Siu are, and at all relevant times were, the sole members of Brimfield.  Brimfield is the minority member of Penn Peak Capital, LLC ("Penn Peak"), in which Michael was the majority member.

## JURISDICTION AND VENUE

52.     This Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 and 1343(a).

53.     This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a), inasmuch as such claims are so related to the federal claims pled in this complaint that that they form part of the same case or controversy for purposes of Article III of the United States Constitution.

54.     This Court has personal jurisdiction over the individual defendants because each of them resides in the Commonwealth of Pennsylvania.

55.     This Court has personal jurisdiction over Ronald, Michael and Ronald, LP, RRM Associates, LLC, Ronald and Robert Donatucci, LP, Mannion Prior, LLP, and Brimfield because each has its principal place of business in Philadelphia, Pennsylvania, or, in the case of Mannion Prior, LLP and Brimfield, in Montgomery County, Pennsylvania; because upon information and

belief each conducts substantial business activities in Pennsylvania; and because a substantial part of the conduct that gives rise to Plaintiffs' claims against these entities occurred in Pennsylvania.

56.     This Court has personal jurisdiction over WSFS because the Bank conducts substantial business activities in Pennsylvania, through multiple offices that serve consumers and businesses, and because a substantial part the conduct that gives rise to Plaintiffs' claims against these entities occurred in Pennsylvania.

57.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) in that the Defendants reside in this judicial district or in the Commonwealth of Pennsylvania, and because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and a substantial part of the property that is the subject of the action is situated in this judicial district, as further alleged below.

## FACTUAL ALLEGATIONS

### A. DONATUCCI'S GOVERNMENTAL POWER

58.     Donatucci serves in the elected position of Register of Wills for the City of Philadelphia, a position he has held for 39 years, since 1980.  The Register of Wills is charged with probating wills and granting letters of administration in cases in which the deceased dies intestate or letters testamentary in cases in which the deceased dies testate.  In cases in which a will is challenged, the Register hears testimony concerning the challenge and makes a determination to accept or reject the will for probate.  In this way, the Register acts as a judge and resolves disputes between private parties in the manner of a judicial branch judge.  The disposition of valuable property interests may be at stake and Donatucci is charged with deciding who wins and who goes away empty handed.

59.     In his official position, Donatucci is held to a standard of conduct that prohibits his engagement in financial or business dealings or personal activities that may detract from his impartiality or exploit his official position.

60.     In spite of this, Donatucci has used his office to create a fiefdom of power through his deft use of patronage hiring. The capacity for patronage is inherent in the structure of the Register of Wills' Office because it is an elected position and the Office's employees do not fall within the City's civil service system.   When Philadelphia city and county offices were consolidated into a single government in 1952, the Register of Wills and his Office was not included.   It was deemed to be "quasi-judicial," and so it fell under state courts.   The Office has since operated as its own political oasis.

61.     For years, Donatucci has conducted himself with a badge of official authority, and used his official power and run his Office with unfettered discretion. As a result, he has been allowed to use his Office and City employees to create his own personal empire, amassing significant personal wealth, power, and influence in such a way that is rare in this day and age. In many other cities, the functions of the Register of Wills are performed by employees within the judicial branch and subject to the jurisdiction's civil service system, a method that has proven to create for a far more effective and less corrupt branch of government.

62.     In fact, it has been repeatedly recommended that Donatucci's Office (among other row offices) be eliminated, including in reports published by the PA Intergovernmental Cooperation Authority, as well as Philadelphia's leading non-partisan good government advisory body, the Committee of Seventy, for the purposes of regaining the public's confidence in the City's workforce (in view of Donatucci's rampant use of patronage to amass power) and saving taxpayer dollars:

> [T] he most compelling reason to change the current structure – and what differentiates the Register of Wills' office from the three other elected officials we discuss – is to eliminate patronage. *Not one of the Register's 68 employees is part of the City's merit-based civil service system.* To our knowledge, no other City department head – not even the Mayor – has the absolute discretion to hire, promote and fire his employees.
>
> The Register's office is well known for its rampant patronage. When a 1994 *Philadelphia Inquirer* series dubbed Register Donatucci "The Prince of Patronage," he had no qualms about defending this practice: "I do not apologize in any way for hiring patronage workers. I did it once and I will do it again. . . . ."
>
>       ***
>
> A quick look at the [employee] names given to us by the City, after the Register refused our request, shows a few ward leaders (including the Register and several top staff members), quite a few committee people and family members of politically active Philadelphians. "The Prince of Patronage" pretty much says it all.

Committee of Seventy, *Needless Jobs: Why Six Elected City Positions Should Die*, at 47, 50-51 (March 16, 2009) (emphasis in original, footnote omitted), attached as **"Exhibit A"**.

63. Despite such reports, only the clerk of quarter sessions ended up being eliminated. Given the power and control Donatucci has amassed over the years, including his relationship with City Council, who would be responsible for approving such a change to the City Charter, it is no wonder his Office has not been eliminated. *See* Pa. Code § 201.8(b).

64. Donatucci was voted out of office in the local elections held on May 21, 2019, and as a result of the election will leave office on January 1, 2020. Yet still, it was recently reported he is making efforts to unionize his Office so that he can continue to have access and maintain his influence.

65. Donatucci is also the Democratic Ward Leader of Philadelphia's Ward 26. In this role, he controls the distribution of patronage jobs within the Ward system.

66. In addition, Donatucci is President of the Board of Directors of City Trusts (the "City Trusts Board"). The City Trusts Board is charged with administering nearly 120 trusts

created by private citizens and consisting of funds left in trust to the City of Philadelphia. Some of these trusts were established as early as the colonial period. Through its control of these trusts, the City Trusts Board controls the use of over a billion dollars (according to Donatucci), left to the City of Philadelphia.

67.     The City Trusts Board is appointed by and accountable to the Judges of the Court of Common Pleas of Philadelphia (those Donatucci helps get elected) and acts on behalf of the City Philadelphia, the beneficiary of the trust funds.

68.     Donatucci's appointment to the City Trusts Board is a lifetime appointment.

69.     Although he is paid by the citizens of Philadelphia to work full time as the Register of Wills and Clerk of the Orphans' Court, Donatucci also has a hand in a variety of private enterprises. He maintains a private law practice with the Philadelphia firm Mattioni, Ltd., where he holds himself out as specializing in land use, zoning, and real estate, and he holds positions on the boards of a number of significant Philadelphia based institutions (including through his role on the City Trusts Board), including Temple University, Wills Eye Hospital Health System (Chair of the Board of Trustees), Temple University Health System, Fox Chase Cancer Center, American Oncologic Hospital & Affiliates, Programs for Exceptional People, to name a few. Most significantly for this case, Donatucci owns and operates a large portfolio of real estate, independently and together with his sons Michael and Donatucci, Jr., which are managed through a family real estate business, Debro Investments. Through his private business ventures he has become a millionaire while simultaneously collecting a city government salary as the Register of Wills and Clerk of the Orphans' Court.

70.     Donatucci is virtually always accompanied by an entourage of City employees, which he uses to conduct his personal business, and he is not shy about using his power and

influence over other departments of City government, including the Philadelphia Department of Licenses and Inspections and the Police Department.  For instance, a prospective buyer for one of the Estate's properties, Don Ventresca, told Meghan that Donatucci takes care of all of his zoning and permits for his real estate projects in the City. Donatucci also arranged to have the Schuylkill Expressway shut down for the funeral procession for his brother (who was not a public official).

71.     Through his nearly four decades of patronage hiring (as well as through his roles as President of the City Trusts Board and Ward Leader), Donatucci has created an empire of contacts who owe him favors and are prepared to deliver.  Those indebted to Donatucci include individuals within and outside government.  His ability to influence individuals inside and outside government and direct them to do his bidding—either directly or because of a shared understanding of Donatucci's expectations—derives solely from his position as Register of Wills and Clerk of the Orphans' Court and the platform for patronage hiring it has provided him for almost 40 years.  His positions of influence as President of the City Trusts Board and Ward Leader, in particular, bolster his image as a wielder of power and someone to please and who should be obeyed.

72.     Although his positions as Register, Board Member, Ward Leader, private lawyer, and private businessman, may create confusion in observers as to which hat he is wearing at any given time, Donatucci's ability to influence people and events derives directly from his position in Philadelphia government as Register of Wills and his use of that office in Philadelphia City Hall through which he has built an empire based on patronage hiring.

73.     Donatucci uses that power to further his private interests and has amassed great wealth by doing so. The City has allowed this to go on for nearly four decades.

21

74.     Donatucci's arrangement with the City is no secret for Philadelphians and has been reported on by the news media over the years, dating back to the early 90s. *See, e.g.*, "Donatucci: Public Official, Private Empire Sometimes, Ronald R. Donatucci Is Philadelphia's Register Of Wills. Other Times, He's A Millionaire Businessman. Or A Lawyer In Private Practice. Often, It Can Be Hard To Tell The Difference." *The Philadelphia Inquirer*, October 17, 1994; "Register of Wills Uses Patronage to Keep Job," *The Philadelphia Inquirer*, March 21, 2011; "'It's patronage. It works:' Donatucci seeks 10th term," *The Philadelphia Inquirer*, October 26, 2015, attached collectively as **"Exhibit B"**.

75.     While Donatucci's actions depart from the Register's common practice, the pattern of his using his office to intentionally discriminate for his own gain is not limited to this case. For example:

- *Sisinia Pro v. Ronald R. Donatucci, Register of Wills*, 81 F.3d 1283 (3rd Cir. 1996), a case that was filed in this Court (Civ. A. No. 94-6001, before the late Honorable Stewart Dalzell) in which Donatucci was the subject of claims of violating civil rights for retaliating against a witness for his former wife during their divorce.

- *Lask v. Ronald R. Donatucci, Register of Wills, et al.*, also filed in this Court (Civ. A. 06-3066, before the late Honorable Norma L. Shapiro), in which it was claimed that Donatucci, represented by DeSimone, was refusing to grant hearings or approve the appointment of a decedent's daughter and intestate heir (who was also an attorney) to serve as administrator of her late mother's estate in favor of a political ally.

76.     By virtue of the power he amassed through 39 years of patronage hiring that could only be carried out by holding the office of Register of Wills and Clerk of the Orphans' Court, at all relevant times Donatucci was acting under color of state law.

## B. MICHAEL'S TRAGIC DEATH IN JULY 2016

77.     Michael's death certificate states he committed suicide on July 15, 2016.

78.     At the time of his death, Michael and Meghan had been dating for more than 10 years, since college, and were due to be married on September 24, 2016.

22

79.     Michael was a Chartered Financial Analyst.  At the time of his death he was employed as the Chief Investment Officer of the Philadelphia Pension Fund, having started that position some six weeks earlier on June 1, 2016, after about eight years with the institutional group at SEI in Oaks, Pennsylvania.

80.     Michael's Will named his fiancée, Meghan, the Executrix of his Estate.

81.     At the time of Michael's death, Michael and Meghan shared an apartment, one of two apartments (both of which were occupied) that were connected to (but separate from) Donatucci's home in the Queen Village neighborhood in South Philadelphia.

82.     Meghan found Michael in their bathroom on the evening of July 15, 2016, dead and covered in blood, upon her arrival home from work.  Michael had died earlier that afternoon in their apartment from an apparent gunshot wound to the head.

**C.  DONATUCCI ATTEMPTS TO RESTRICT MEGHAN'S ACCESS TO INFORMATION UPON MICHAEL'S DEATH & LEARNING THAT MICHAEL'S WILL IS NOT FAVORABLE TO HIM**

**1.     Donatucci Changes the Police and Enlists Other Government Employees to Remove Estate Property from Michael and Meghan's Apartment in Order to Conceal the Circumstances Surrounding His Son's Death and to Gain Control of His Son's Valuable Real Estate Interests**

83.     Meghan tried calling Michael before she arrived at their apartment on the evening of July 15, 2016.  When she arrived at the apartment shortly after 7:00 p.m., she called Donatucci to see if Michael was with him and then found Michael in their bathroom.  Donatucci's only response was to call 911.

84.     Police from the 3rd District of the Philadelphia Police Department responded to Meghan's 911 call and arrived on the scene to investigate shortly thereafter.  When Donatucci arrived, he directed that those police leave the premises and replaced them with other police

officers with whom he was familiar, including Captain Lou Campione from the 1st District of the Philadelphia Police Department. The crime scene where Michael died was in the 3rd District.

85. As a policewoman was escorting Meghan away for questioning, Donatucci grabbed Meghan's arm and began to pull her away from the policewoman, leading to a loud exchange between the policewoman and Donatucci. Donatucci announced to her that she was being replaced. Donatucci was able to direct such orders by virtue of the power he amassed in City government, through decades in his position in City Hall as Register of Wills.

86. The police would not have taken such orders from a private citizen. They did Donatucci's bidding only because of the power he wielded by virtue of his patronage empire and stature in City government permitted by the City's custom allowing Donatucci to conduct himself virtually anywhere and all times with a badge of official authority unchecked by the City and its government officials.

87. In wielding his power allowed by the City for decades, Donatucci was able to successfully interfere with what would have otherwise been a typical (thorough) crime scene investigation. As the scant police file shows, Donatucci was able to conceal circumstances surrounding his son's death, including significantly his finding Michael earlier that day. He was also able to take and withhold Michael's cell phone, which Donatucci or his subordinates at the Register of Wills' Office acting at his direction removed from Michael and Meghan's apartment at some point on July 15, 2016.

88. The police also followed Donatucci's direction that no autopsy be performed.

89. In a pending medical malpractice lawsuit filed by the Estate, a Subpoena served upon the Custodian of Records of the Philadelphia Police Department, 3rd District, required the following to be produced: "Police report and photos from investigation of suicide by gunshot

wound of the head of Michael Donatucci on July 15, 2016 at 108 Queen Street, Philadelphia, PA 19147." A copy of the Subpoena is attached as **<u>Exhibit C</u>**. In response, the 3rd District produced copies of an unsigned crime scene log, an unsigned crime scene information sheet, an unsigned complaint or incident report, a partially executed and incomplete property receipt form, two investigation interview records (one signed by Meghan and the other by Donatucci), page 2 of 2 of a trace request regarding a gun, an unsigned two page investigation report, and an incomplete record in regard to the driver license details for Meghan and Michael. A true and correct copy of these documents is attached as **<u>Exhibit D</u>**.

90.     The investigation report above lists "actions taken" as including "Crime Scene Photos Taken."  However, the Police Department withheld those items and produced no photos in response to the Subpoena. Absent from the list is Michael's cell phone as well as Donatucci's cell phone on which Donatucci alleges he received a text message from Michael that same afternoon, at "about 3:30 pm" according to the investigation interview record signed by Donatucci above. Also absent from the list is any mention of a review of Donatucci's surveillance cameras which are posted at nearly every angle surrounding Donatucci's home and carriage house where Michael and Meghan's apartment was located.

91.     Upon information and belief, Donatucci's surveillance cameras indicate that Michael arrived home to his apartment that afternoon at almost the same time Donatucci arrived home to his house next door.  Based on information and belief, this surveillance information was concealed by Donatucci from, and/or was not reviewed by, the Philadelphia Police Department.

92.     While Donatucci let on to Meghan and, based on the police report, authorities, that he learned of Michael's passing from Meghan that evening (after 7:00 p.m.), on information and

belief, it has since been discovered that Donatucci actually learned of Michael's death much earlier that afternoon, around the time of Michael's death at approximately 3:00 p.m.

93.     Around that time, Donatucci received a text message from Michael asking him to come find him so that Meghan would not. On information and belief, the firing of the gun that ended Michael's life would have been heard in and around the Donatucci property.

94.     Also around that time, according to information recently discovered, Donatucci called his son Donatucci, Jr. to inform him that Michael had died. This information was discovered from a recorded presentation made by Donatucci, Jr., president and co-founder of the Michael P. Donatucci Foundation, Inc., entitled "Bouncing Back: Anxiety and Depression", a copy of which is found at https://vimeo.com and attached hereto as **"Exhibit E"**, stating in relevant part:

> . . . Any ya know it's just ugh me and my father, as soon as this happened, I remember the day like it was yesterday, I was down the shore, around 3 o'clock I got the call that you know that your brother's dead, and I said what do you mean my brother's dead, I don't understand what you mean. And ugh yea he took his own life. So it was just completely devastating. . . .

95.     Donatucci did not call 911 to report his son's death.

96.     Based on this sequence of events, it is believed that *Donatucci was the one to first find Michael—not Meghan.*

97.     Rather than contacting authorities upon learning of his son's tragic death, *Donatucci intentionally left Michael for Meghan to find* upon her arrival home from work that evening in conjunction with a scheme concocted with his other son, Donatucci, Jr. and, shortly thereafter, attorneys who represent his Office and/or the City Trusts Board (discussed below), as well as, on information and belief, Donatucci's current wife Stephanie Donatucci.  The scheme was intended to conceal (what to this day are unknown) circumstances surrounding Michael's death as well as gain control of Michael's valuable real estate interests, interests that Donatucci

(and his current wife Stephanie Donatucci) and Donatucci, Jr. believed were better suited in their hands than Meghan's and Michael's mother's (Donatucci's ex-wife, Foglietta).

98.     On information and belief, Stephanie Donatucci was either present at the Donatucci property in the Queen Village section of South Philadelphia when Michael died on July 15, 2016, or soon thereafter became aware of her husband finding Michael (before Meghan) as described above.  On information and belief, Stephanie Donatucci, Donatucci, Jr., Donatucci, and others have agreed to participate in the scheme described in this Complaint and to withhold and cover up such information from police and Meghan as part of that scheme.

99.     Donatucci's actions that evening were particularly odd, including his discussion of starting a foundation in Michael's name that same night. The "Foundation" was all he could talk about in the days and weeks that followed, and he insisted money be raised immediately, even before Michael's funeral.

100.     That evening (and perhaps earlier that day in view of these recently discovered facts) Donatucci, certain family members, and City employees acting at his direction (including his son Donatucci, Jr., his wife Stephanie Donatucci, and City employees, Claudine Catalano, (and her husband, Thomas Pipino) and Damian Ruth, among others), entered the apartment Michael and Meghan shared and went through and removed their belongings, including among other things Michael's cell phone and his Will.

101.     Michael's Will was in his "Tumi bag" (per an email from Michael, discussed below) in the apartment he shared with Meghan at the time of his death on July 15, 2016.

102.     Meghan noticed Michael's Tumi bag was on the bed in their apartment on the evening of July 15, 2016.  She reported this to the police that evening. **Exhibit D**.

103.    Donatucci took from the apartment Michael's Tumi bag and brought it into his home shortly after his arrival at the apartment on the evening of July 15, 2016. Based on information and belief, Donatucci removed Michael's Will from his Tumi bag.

104.    At some point on July 15, 2016, as well, Donatucci took possession of Michael's cell phone.

105.    In the days, weeks, and even months that followed, Donatucci, his family members (including Donatucci, Jr.), and Philadelphia City employees under his control continued to access, disturb, and remove items from the apartment.  Meghan discovered some of those items upon her visits to the Donatucci home prior to the funeral.  Donatucci did this without Meghan's permission, and over her objection, showing her no respect or consideration and failing to even provide any sort of transparency as to who was entering the apartment and what was being handled and/or removed.  Shortly after Michael died, Donatucci even changed the locks to the apartment to prevent Meghan from gaining access to her and Michael's belongings, which to date have yet to be turned over.

106.    Donatucci's actions were far from those expected of a grieving father, as they occurred repeatedly and over Meghan's objections, and, in retrospect, at all times were intended to control and conceal.  For instance, weeks after Michael's death, after Meghan pleaded that he not enter the apartment (or have others enter the apartment) without her, Meghan learned that Donatucci's subordinate employee, Damian Ruth ("Ruth"), administrative assistant to the Register of Wills, "cleaned out" the apartment at the request of Donatucci.  In fact, Meghan learned of this when she went to gather belongings from Michael's car (which she learned upon her arrival had already been removed) before it was turned into the dealership.  Donatucci directed Ruth to meet Meghan to give her access to the car.  Ruth opened the garage door at Donatucci's home to obtain

28

Michael's car key and revealed (evidently by mistake) Michael's and Meghan's belongings in boxes strewn about the garage. A distraught Meghan started gathering her things, at which time Donatucci, having seen what was occurring on his surveillance cameras that he monitors on his phone, furiously directed Ruth to stop Meghan from removing the items from his garage and then proceeded to yell at Meghan and her mother.

107.    As regards Michael's cell phone, despite promising many times to deliver it to Meghan, who, according to Michael's Will was also named Executrix of Michael's Estate, and his "Digital Executor" and beneficiary of his <u>digital</u> assets (in addition to being Michael's fiancée), Donatucci refused to allow her even to see it and maintained possession of the phone for over two and a half years. Through Michael's phone, Donatucci also gained immediate control of Michael's email accounts, to which he later changed the passwords to block Meghan from accessing.

108.    Donatucci directed a City employee, Emilio DiGregorio ("DiGregorio"), executive administrator to the Register of Wills, to maintain possession of Michael's cell phone to ensure that Meghan would have no access to it. DiGregorio had complete and unfettered access to the information on the phone and to Michael's email and other accounts, to the exclusion of Meghan. The cell phone and various accounts were searched by DiGregorio at Donatucci's direction and the passwords to Michael's email accounts were changed by Donatucci, preventing Meghan from accessing the accounts.

109.    On information and belief, because of his relationship with the police he had replace other police who arrived on the scene following Meghan's 911 call on July 15, 2016, Donatucci was able to keep Michael's cell phone, as well as his own phone, from being part of an investigation of Michael's death.

110.    Meghan was forced to seek judicial relief to obtain the return of Michael's cell phone and email accounts from Donatucci.  Only after two Orders dated June 12, 2018 and December 13, 2018 were issued by the Honorable Ronald C. Nagle, Senior Judge of the Court of Common Pleas of Chester County (who upon the Estate's petition, was appointed to preside over Orphans' Court proceedings regarding this Estate, discussed *infra*), did Donatucci turn over Michael's phone and new passwords after having handled and tampered with its data.

111.    Donatucci's concealing of information, not only from authorities, but from the Court as regards the phone and email accounts, should not have occurred, but did because of Donatucci's governmental power that the City has permitted him to have in Philadelphia government under the misnamed and misleading title of Register of Wills and Clerk of the Orphans' Court.  In his position as Register of Wills and Clerk of the Orphans' Court, Donatucci has been permitted to use this power for decades to control positions and decisions in Philadelphia government.  Donatucci's power was permitted to develop over time through his deft use of government resources, including substantial patronage hiring and control over governmental employees, that the City authorizes him to have and control.

112.    Donatucci and Mannion were incredulous when Plaintiffs asked for relief from the Orphans' Court to compel them to turn over Meghan's and Michael's belongings, including Michael's cell phone and new passwords Donatucci created for Michael's email accounts. Donatucci and Mannion lied to Judge Nagle, denying that Donatucci accessed Michael's and Meghan's shared apartment and took their belongings (which Donatucci's surveillance cameras would disprove), including Michael's phone, and denying that Donatucci (or City employees at his direction) accessed and changed the passwords to Michael's email accounts. Donatucci and Mannion even falsified phone records concerning Michael's cell phone to avoid having to turn

over the phone.  They were later caught in that lie to Judge Nagle when Donatucci was forced to turn over the cell phone (which he took from the apartment) and new passwords to the email accounts pursuant to Judge Nagle's Orders dated June 12, 2018 and December 13, 2018.  Mannion was willing to participate in Donatucci's scheme and report lies to the Court with full knowledge that Donatucci and Donatucci, Jr. had accessed Michael's shared apartment and had gone through Michael's records. Mannion knew this as early as August 31, 2016 when he revealed to Meghan's original counsel, Richard Lipow, Esq., a cell phone photograph Donatucci and/or Donatucci, Jr. had taken inside the apartment shortly after Michael passed.

113.    In the Chester County litigation (discussed *infra*), Donatucci also was forced to admit to having destroyed text messages, emails and other records covered by the Court's discovery Orders against him.

114.    To date, Donatucci and Mannion refuse to turn over copies they allegedly made of Michael's cell phone and email accounts, despite the fact that Judge Nagle's December 13, 2018 Order found that such information was taken improperly without right and without notice or permission of the Executrix.  Judge Nagle found Donatucci inappropriately had "free and unfettered access" to Michael's cell phone and email accounts for two and half years after Michael's death, to the exclusion of Meghan (and governmental authorities).  This was made possible only as a result of the power the City has permitted Donatucci to have through his deft use of government resources, including substantial patronage hiring and control over governmental employees that the City authorizes him to have and control.  Donatucci took these steps not only to conceal circumstances of his son's passing, but to block Meghan from obtaining information and things, including relevant to the business disputes between Michael, his father, and his brother

(and now the Estate), to make it harder for her to carry out her role as Executrix so that he could gain control of the Estate and its valuable real estate interests.

115.    Based on information and belief, Stephanie Donatucci knows that Donatucci has been carrying out the foregoing tortious conduct and conspiracy, as she apologized to a member of Meghan's family.  Yet, on information and belief, Stephanie Donatucci has been and is continuing to participate in Donatucci's scheme to withhold property of Plaintiffs in order to enrich herself and Donatucci.

### 2.    Michael's Boomerang Email Calls Donatucci Out and Forces Him to Return Michael's Will That He Took

116.    By taking possession of Michael's Will on July 15, 2016, unbeknownst to Meghan, Donatucci became fully aware of its contents on that date and the days that followed.  Donatucci initially hid the Will from Meghan for several days following Michael's death, as he went about planning Michael's funeral without any input from her.  Significantly, he and Donatucci, Jr. picked out a family mausoleum for which they later attempted to charge the Estate.

117.    Michael's Will may never have been discovered but for an email Michael sent delayed (via a program called "Boomerang") to Meghan, Donatucci, and Foglietta for delivery on July 18, 2016, three days after Michael's death.  Michael's email explained that the original of his Will was in his Tumi bag.  That Tumi bag which Donatucci had taken into his house on Friday night, July 15, 2016, did not contain Michael's Will when Meghan took it from Donatucci's house on Sunday, July 17, 2016.

118.    It was only after Donatucci learned of Michael's "Boomerang" email and others were informed of the Will's existence and location, that Donatucci returned the original Will to the apartment (he was unable to return it to the Tumi bag which Meghan had taken the day prior to Michael's "Boomerang" email).

119.    On information and belief, Donatucci, Jr. and Donatucci's life-long friend, DeSimone, and attorneys who have represented the Register of Wills and/or the Board of City Trusts (including Gillin, Mannion and Golden) are knowingly participating in Donatucci's scheme and this cover-up.  While Golden has historically done Donatucci's bidding (for example, refusing to produce public records at the public's request), he, Mannion, DeSimone, Donatucci, and Donatucci, Jr. together have weaved a false narrative that Donatucci had not entered Michael and Meghan's shared apartment (and not caused anyone else to enter the apartment) and not taken their belongings (including Michael's Will and phone) following Michael's death, including significantly that Donatucci did *not* take Michael's Tumi bag.

120.    Far from working as private actors with mere professional interest, these attorneys at all times went far beyond working in good faith for the purpose of protecting the interests of their clients, but rather in pursuit of their personal interests they acted with intent to harm pursuant their agreement with Donatucci.

121.    Michael's Will named two beneficiaries.  One beneficiary was his mother, Foglietta, who is the sister-in-law of the Honorable Angelo Foglietta, a Judge of the Court of Common Pleas of Philadelphia and close friend of Donatucci's.  The other beneficiary was his fiancée, Meghan.

122.    Michael's father, Donatucci, and Michael's mother, Foglietta, divorced in the early 1990s and have had a historically contentious relationship.

123.    Neither Michael's father nor his brother, Donatucci, Jr. (also Foglietta's son), are beneficiaries of the Estate.

124.    Foglietta's interest in the Estate consists of a 25% share of Michael's interests in real estate he held with his father, Donatucci, and brother, Donatucci, Jr. ("Michael's Commonly-

Held Realty Interests").  Those properties which Michael owned with his father and brother represent only a portion of Donatucci and Donatucci, Jr.'s real estate holdings.

125.    The other 75% of Michael's Commonly-Held Realty Interests was left to Meghan. In addition, Michael left Meghan (i) a property in which Michael was a 100% owner (the "20th Street Property"); (ii) his majority interest in another property (the "Girard Avenue Property"); and (iii) all other accounts and assets of the Estate.  Meghan is also the residual beneficiary under Michael's Will.

> **3.**    **Donatucci Makes a Determination that There is No Basis for Challenging Michael's Will or Meghan's Appointment As Executrix and He Makes the Judicial Decision to Admit the Will for Probate**

126.    On August 11, 2016, Michael's Will was admitted to probate by Donatucci, acting in his official capacity as Register of Wills.  Donatucci had insisted that the Will be probated, and wanted to do so at Meghan's parents' home in Lafayette Hill, Montgomery County, and not at the Register of Wills' Office in Philadelphia. Meghan preferred to probate the Will at the Register of Wills Office in Philadelphia, which Meghan later learned angered Donatucci.  Donatucci did not show up for the meeting at his office on August 11, 2016, and directed his staff to handle the meeting and processing of paperwork.

127.    During the probate, an employee at the Register of Wills' Office, who was not involved in the probate, took a photograph on his phone of Meghan and her family and her attorney. Based on information and belief, Donatucci directed the photograph to be taken and sent to him to identify Meghan's attorney.  Meghan later learned Donatucci was angry that she brought a lawyer to the probate.

128.    On the day of the probate, Donatucci, Jr. and Michael's partner, Siu, met at the Girard Avenue Property, unbeknownst to Meghan. Based on information and belief, Donatucci also was present at this meeting.

129.    Following the probate, Letters Testamentary were granted to Meghan as Executrix by Donatucci himself.

130.    In doing so, Donatucci thus made a judicial determination that there were no grounds for refusing Michael's Will (i.e., he affirmed the validity of the Will) or refusing to issue Letters Testamentary making Meghan the Executrix.

131.    Had there been any valid basis to refuse Michael's Will, Donatucci would have recused himself or issued an informal (or formal) caveat.  Rather, Donatucci insisted Meghan probate the Will because he knew no basis existed to bring such a challenge.  Based on information and belief, because contesting was not an option, Donatucci, upon consulting with two probate and estates attorneys employed by the City and/or the Board of City Trusts (discussed below) shortly after Michael died and *prior to the probate*, devised a scheme to admit the Will to probate with a pre-determined agenda for Donatucci to strong-arm the Estate, Meghan, and her family for his own personal gain.  This was a flagrant, egregious, and appalling abuse of state power which could not have occurred in Philadelphia but for Donatucci's power amassed in his position as a member of City government permitted by the City for decades as noted above.

132.    Donatucci consulted with and enlisted the help of Mannion of Mannion Prior, LLP (together, "Mannion") and Eugene H. Gillin ("Gillin") of the Harkins & Harkins Firm.  Mannion is a probate and estates lawyer for the Board City Trusts, and Gillin is a probate and estates lawyer for the Register of Wills/Orphans' Court.  In fact, both Mannion and Gillin have written extensively on the topic of probating wills, having published "The Anatomy of a Will Contest"

and the "Philadelphia Estate Practitioner Handbook" (that is part of the procedures followed by the Philadelphia Register of Wills office and Orphans' Court, and is published on the website of the Register of Wills office), respectively.

133.    Based on information and belief, Donatucci, together with Mannion and Gillin, as well as, Solicitor Golden (who Donatucci immediately set up, along with DeSimone, to represent his ex-wife as part of the scheme), determined that Donatucci had no basis to prevent Meghan from becoming Executrix.  So, they set out to pursue other, more subversive means to achieve Donatucci's goal.  Mannion and Gillin, both longtime employees/colleagues of Donatucci and reapers of Donatucci's political machine, acquiesced.  They determined that Donatucci would probate the Will (despite his conflict of interest), and Mannion agreed, with the assistance of Gillin behind the scenes, to do Donatucci's bidding, which included a full court press on the Estate immediately following the probate, while emotions were still running high.

134.    Shortly after the probate, Mannion threatened that if the Estate did not turn over Michael's real estate interests—those which Michael shared with his father and brother—for nothing, along with Meghan's position of Executrix, Donatucci would bring a will contest. Mannion's threats, and various attempts at interference with the Estate (including withholding information and things) which were intended to force Meghan to succumb to Donatucci's demands, would continue over the course of the next several years.

135.    Donatucci waited until a year later to file his Will Contest only to ultimately withdraw it because Donatucci, Mannion, Gillin, and Golden well knew that it was at odds with the facts.  Even when filed it served only as a threat and means of extortion.  Donatucci's repeated requests for stays made that abundantly clear, as did the lengths to which Donatucci has gone to withhold and conceal information, even under court order.  Donatucci of course knew that recusing

himself/filing a caveat would open up discovery and investigation (including his phone and other records, which he needed to keep from the police in order to continue hiding what happened on July 15, 2016, and which he has since had three years to tamper with), which was a risk he was not willing to take.  Rather, he deliberately delayed to prevent those records from being discovered.

136.    Donatucci was particularly not willing to take these "risks" given the publicity his Will Contest would have gained in view of statements he made just weeks prior (including at the funeral), in which he boasted of Michael's performance at work in the weeks leading up to his death and even on the date of his death, and his son Donatucci, Jr.'s eulogy in which he praised Meghan for keeping Michael alive for the past ten years.  This information was far too fresh to contradict so soon with a Will Contest, which clearly Donatucci and Donatucci, Jr. knew would have been at odds with the facts.  This is also why Donatucci shut down his docket to public access when he ultimately filed his Will Contest (and Removal Petition).

**D.  DONATUCCI USES THE WITHOLDING AND CONTROL OF INFORMATION TO UNDERMINE AND INTIMIDATE MEGHAN AND LAY THE GROUNDWORK FOR ATTEMPTING TO REMOVE AND REPLACE HER AS EXECUTRIX**

137.    By statute, one aspect of Meghan's fiduciary duty as Executrix is to "take possession of, maintain and administer all the real and personal estate of the decedent." 20 Pa. C.S.A. § 3311.  In other words, Meghan bears the responsibility to "preserve and protect the property for distribution to the proper persons within a reasonable time." *In re Estate of Campbell*, 692 A.2d 1098, 1101 (Pa. Super. 1997).  Thus, as Executrix, Meghan has the right to take possession of all assets, items and personal papers, documentation, and things of Michael's personal estate. 20 Pa. C.S.A. § 3311.  As Register of Wills and Clerk of the Orphans' Court, Donatucci of course knows this, as does his counsel Mannion, a probate and estates attorney. Indeed, the Register of Wills' website specifically states that the role of the "personal

representative," or Executrix in this case, includes "locating and <u>protecting</u> the assets of the estate." Emphasis added.

138.    As Executrix, Meghan has the right to require the production of information, documentation, and things by Donatucci as part of her inherent powers and duties under 20 Pa. C.S.A. § 3332.  This includes those documents and things that Donatucci took from Michael and Meghan without permission as well as information and things Donatucci owes to Meghan by virtue of the Estate's interest in real estate it owns with Donatucci. As Register of Wills and Clerk of the Orphans' Court, Donatucci knows this and so does his counsel, Mannion, yet at all relevant times, Donatucci and Mannion withheld and otherwise interfered with Meghan's obligations as Executrix in pursuit of their own personal interests and scheme.

139.    In addition to directing City employees, including Claudine Catalano (and her husband Thomas Pipino), Damian Ruth, and others, to take and remove Estate property from Michael and Meghan's apartment virtually at the moment Michael's death was discovered and in the days following, and directing City employee Emilio DiGregorio to keep Michael's cell phone from Meghan, as noted Donatucci instructed his city employee, Damian Ruth, to remove some of Meghan and Michael's belongings from their apartment shortly after Michael's death, again without notice to Meghan and without her permission. Donatucci, Jr. and Donatucci's wife, Stephanie Donatucci, also participated in removing, and/or keeping Meghan from having access to, records and things from the apartment.

140.    Donatucci also changed the locks on the apartment Meghan and Michael shared immediately following Michael's passing and failed to provide Meghan with a new set of keys, and he and his wife, Stephanie Donatucci, prevented her from retrieving and marshaling Estate property and even her own separate belongings.

141. Written communications also reveal that Donatucci used his City employees, specifically Emilio DiGregorio and Samantha Valtri, to conduct business and assist him in his attempts to undermine the Estate *while they were on City time using their personal email (gmail.com) accounts to avoid being caught*. Donatucci had them communicate regarding the Commonly-Held Realty Interests (including with lenders and Debro Investments employees) as well as assist with valuations of Michael's assets and the finances of his Estate.

142. Donatucci's purpose in enlisting City employees to take Estate property and maintain possession of Michael's cell phone and email accounts, and changing the locks on Michael's and Meghan's apartment was to intimidate Meghan, conceal circumstances surrounding Michael's passing, and deny her the information she needs to fulfill her duties as Executrix, with the ultimate goal of wresting control of the Estate and seizing the Estate's valuable real estate interests for the benefit of himself, as well as his wife Stephanie Donatucci and his surviving son Donatucci, Jr., both of whom have been willingly participating in Donatucci's scheme against Meghan for their own enrichment.

143. Donatucci, who had a relationship with Michael's boss at the Pension Fund, also obtained items of Michael's from Michael's employer without informing Meghan as the Executrix. When Meghan contacted the Pension Fund for these items, the Pension Fund refused to cooperate with Meghan and turn over to her Michael's personal belongings and USB flash drives, ultimately providing her only with redacted copies.

144. The Pension Fund, which was drained by the City's DROP Program in which Donatucci participated, has faced much scrutiny over the years. Despite the fact that taxpayers are forced to contribute significantly to fill the fund, the Pension Fund, like Donatucci's Office, has refused to provide facts about its pension deals with workers.

145.    Donatucci, through Mannion, has demanded that the Estate release his surviving son Donatucci, Jr. from a substantial debt owed to Michael. They make this demand while refusing to provide any records (Donatucci, Jr. claims to have destroyed his). Based on information and belief, information belonging to the Estate regarding this debt was taken and/or destroyed by Donatucci, Donatucci, Jr., and/or Donatucci's subordinate City employees from Michael's records and phone on the day and days following Michael's death.

146.    Taking control of the Estate from Meghan by replacing her as executor would allow Donatucci to release his son from the debt.

147.    Donatucci and Mannion, to date, have only produced incomplete information, including regarding debts, re-published information from the public record regarding tax assessments that the Estate already had obtained from the public record, a few incomplete bank valuation reports, and reports only recently prepared by an accountant without including any source documents (such as the Quickbooks).  Donatucci does not want to provide this information to Meghan, as it would disprove his unsubstantiated position that Michael's Commonly Held Realty Interests have a "negative value," as he and Mannion claim.  Donatucci's and Mannion's "negative value" starkly contrasts that of Donatucci's deceased son, who was a Chartered Financial Analyst and intimately familiar with the finances related to the Commonly-Held Realty Interests. Michael valued the interests Donatucci was trying to take control of at nearly a $2 million dollar net value in 2016.

E.    **DONATUCCI USES HIS EMPIRE OF INDIVIDUALS AND INSTITUTIONS BEHOLDEN TO HIM TO ATTEMPT TO GAIN CONTROL OF THE VALUABLE REAL PROPERTY OWNED BY THE ESTATE FOR HIS (AND DONATUCCI, JR.'S, AND HIS WIFE'S) PERSONAL BENEFIT**

148.    Immediately following Michael's death, Donatucci initially made efforts to draw an unsuspecting Meghan in, not only by probating Michael's Will but by insisting (repeatedly)

that she remain close with the family, serve on the board of the Foundation he started on the day Michael passed, participate in a golf outing to raise money for his Foundation that he was determined to have just two short months after Michael's tragic passing, and repeatedly telling Meghan he would "need" her to bring a malpractice action against the doctors (despite the fact that as Executrix only she has the authority to bring such a claim).

149.    In view of the inconsistencies and unanswered questions surrounding Michael's death as well as the substantial efforts to conceal and withhold information from Meghan, it appears Donatucci and Donatucci, Jr. are using the Foundation to perhaps control a narrative.

150.    When it became apparent Meghan was not willing to acquiesce to Donatucci's various demands, including that she serve on the board of his Foundation, and that she required her and Michael's belongings (including significantly, Michael's phone), and despite expressing to Donatucci and Mannion repeatedly that she needed some time to grieve the tragic and traumatic passing of her fiancé, Donatucci and Mannion only pushed harder.

### 1.    The Valuable Girard Avenue Property

151.    At the time he died, Michael was the majority member of Penn Peak Capital, LLC ("Penn Peak").  Penn Peak owns the Girard Avenue Property, located in the booming Francisville section of Philadelphia.  It was to be developed into a 7 unit commercial apartment building.  The minority member in Penn Peak is Brimfield Capital, LLC ("Brimfield"), which is controlled by Hau-Kay T. Siu ("Siu") ("Brimfield/Siu").

152.    When Michael purchased the property, Donatucci, Jr., who had been developing other real estate in that area, was furious with Michael and the realtor that he was not given the opportunity to purchase it first.

153.     This reaction by Donatucci, Jr. was not atypical. For years, Donatucci, Jr. had been stealing from the family real estate business (Debro Investments), squandering and misusing its resources, including to start up his own, separate partnership and real estate development business, all while on Debro Investments' time and salary.  This caused significant turmoil in the family and a significant rift between Donatucci, Jr. and his brother, Michael, who were often not on speaking terms.  Michael even tried to bring in a family counselor, but his efforts were rejected by his brother and father.

154.     Wilmington Savings Fund Society, FSB ("WSFS" or the "Bank") is the mortgagee on the Girard Avenue Property.  The loan balance on the date of Michael's death was approximately $325,600. The Girard Avenue Property was conservatively appraised at $460,000 in early 2016.

155.     Donatucci has a longstanding relationship with WSFS, which is also the mortgagee on a number of Donatucci's and Donatucci, Jr.'s real estate holdings.

156.     WSFS served not only to benefit from the substantial business Donatucci and his son Donatucci, Jr. brought to the Bank personally, but also indirectly through Donatucci's power and influence in Philadelphia government and business.  Donatucci's various roles (obtained by virtue of his position as Register of Wills), including President of the City Trusts Board (controlling over a billion dollars of the City's funds, according to Donatucci), Ward Leader, Chairman of the Board of Temple University, and Chairman of the Board of Wills Eye Hospital, among others, put him in a unique position of power and influence.  Notably, substantial institutions in Philadelphia are controlled by the City Trusts Board of which Donatucci is the head – a position to which he was appointed for life by the Judges of the Court of Common Pleas of Philadelphia, many of whom he helped get elected. In this lifetime appointment to the City Trusts

Board, Donatucci is accountable only to those same Judges.  The Bank benefits from the access it gets through Donatucci because of his Office and the power it provides, not only to the leaders in politics and the various branches of government but the leaders of some of the City's most lucrative businesses and institutions.  On information and belief, in this way Donatucci is in a position to generate substantial business for the Bank and even influence those responsible for instituting state regulatory actions that would also impact the Bank.  On information and belief, WSFS's recent acquisition of Philadelphia based Beneficial Bank and expansion into the Philadelphia market certainly would have been a factor in their decision to align with Donatucci.

157.    Donatucci has served as a Ward Leader of the Philadelphia Democratic Executive Committee for nearly forty-five years (since 1974). It is a well-known fact that Philadelphia Ward leaders are the most "powerful players behind Philadelphia elections" and their endorsements have "huge influences over who gets elected in Philadelphia."  Phillywardleaders.com. Donatucci is credited for getting many of the judges (both judges of the Court of Common Pleas and the Pennsylvania appellate courts) as well as city officials elected. Based on information and belief, he has backed countless judges (as well as senators, state representatives, governors, congressmen, Supreme Court justices, and city controllers and councilmen) through endorsements and/or financial contributions to their campaigns. These judges also support (and contribute to) Donatucci's re-election campaigns, as do the political heavyweights of Philadelphia and Pennsylvania (from city councilmen to senators and congressmen), labor unions, various PACs, law firms, and banking/health/educational institutions.

158.    For instance, as discussed below, Donatucci reportedly helps other real estate developers obtain zoning and permits through the Department of Licenses and Inspections.  Years back Donatucci used to work in L&I, and his son Donatucci, Jr. currently serves on its Board.

Donatucci's insurance broker for his real estate, William Kramer, also serves on the Board.  In just this one aspect, Donatucci and Donatucci, Jr. are in a position to substantially impact the Bank with their influence.

159.    In fact, WSFS has admitted their actions in this case were taken based on its substantial relationship with Donatucci.  When the private banking team's handling of the loan was discussed internally, WSFS's private banking team stated, "[The Penn Peak loan] is a very small piece of a very big relationship both commercial and private banking."

160.    Donatucci used the power of his Office as leverage over WSFS to obtain its agreement to participate in his scheme to remove Meghan as Executrix and help him wrest control of Michael's Commonly-Held Realty Interests and Girard Avenue Property, including by having the Bank intentionally mislead Meghan and then attempt to call the loan to falsely cast her in a negative light as Executrix, which Donatucci, Donatucci, Jr., Mannion, DeSimone, Golden, and Foglietta ultimately used in the Removal Petition filed in Foglietta's name to make arguments that are at odds with the true facts.  Donatucci was only able to obtain the Bank's agreement to participate in this scheme because of his Office.

### 2.    Donatucci Enlists WSFS (and Siu) to Help Squeeze Meghan Out of the Girard Avenue Property

161.    In the days and weeks following Michael's death, Donatucci and Donatucci, Jr. were in touch with Siu unbeknownst to Meghan.  In fact, on the day Donatucci arranged the probate to take place, Donatucci Jr. (and based on information and belief, Donatucci) met with Siu at the Girard Avenue Property without informing Meghan.

162.    On August 26, 2016, and days following, within scarcely a month of Michael's passing, Meghan was in contact both in person and by phone with WSFS to make the mortgage payments as well as obtain information regarding the loan.  Despite providing the necessary

paperwork to prove Michael's death as well as her position as Executrix, the Bank refused her payment and refused to provide her with information.

163.    Meghan was told by WSFS that she would have to prove her ownership in Penn Peak if she wanted to make payments or obtain loan information.  At the time, Meghan did not have access to a copy of the Penn Peak Operating Agreement.  Even though WSFS already had a signed copy of the Operating Agreement in its file, the Bank refused to respond to Meghan's inquiries about the loan or to accept her payments without her producing another copy of the Operating Agreement to the Bank.

164.    The Bank's position in this regard was directed by Herbert M. Matter, the Vice President of Private Banking who was the "Relationship Manager" for the Penn Peak loan.

165.    Mr. Matter was aware of Michael's passing almost immediately, and was also in contact with Michael's father, Donatucci, and brother Donatucci, Jr.

166.    Unbeknownst to Meghan at that time, on information and belief, Donatucci, Donatucci, Jr., and the Bank agreed, and were working together, to set Meghan up to default on the mortgage loan, including by blocking her payments.  Donatucci, Donatucci, Jr., and Mannion, in furtherance of their scheme, wanted the Bank to put pressure on Meghan, including to declare a default so that Meghan would have to sell her interest to Donatucci and Donatucci, Jr. cheaply or to be able to buy it from the Bank after foreclosure.

167.    In fact, it has been revealed that Matter was regularly in contact with Donatucci and Donatucci, Jr. (and their representatives) in the days and weeks following Michael's passing about Michael's Estate and Donatucci's and Donatucci, Jr.'s desire to obtain control of it, including Michael's Commonly-Held Realty Interests and Michael's interest in Penn Peak and the Girard

Avenue Property.  Matter at that time was falsely reporting internally at the Bank that he was in contact with the Estate. For example, *before Meghan made contact with the Bank on August 26,*

- On August 16, 2016, Matter stated, "The guarantor for this loan unfortunately passed away last month. I am working <u>with the executor</u> of our guarantors['] estate on payment options going forward."  Emphasis added.

- On August 23, 2016 it was again reported by Matter's team that the "Client is deceased and Rm [i.e., "relationship manager," Herbert Matter] is working <u>with Estate</u> to get this small balance resolved [as regards overdraft fees of a Penn Peak checking account]." Emphasis added.

168.  On August 31, 2016, Mannion, met with the Estate's counsel (at Mannion's request) at which time various demands were made, and a will contest was threatened (for the first time).  Meanwhile, the probate occurred only weeks earlier (at Donatucci's request), on August 11, 2016.  Mannion insisted Meghan turn over Michael's Commonly-Held Realty Interests and relinquish her role as Executrix.  At this time he threatened a will contest if she refused to do so.

169.  On information and belief, on August 30, 2016 Donatucci and Donatucci, Jr. had a call with Matter in anticipation of the August 31 meeting.  On August 30 Meghan also received a call on behalf of Matter advising that the Bank would not give her information or accept her payments on the loan.

170.  Matter continued to speak with Donatucci and continued to falsely paper a trail at the Bank claiming it was in contact with the Estate, which it was not.  For example,

- On September 1, 2016 it was again reported by Matter's team that "[the Penn Peak loan] could get resolved by Donatucci Sr. agreeing to take over responsibility for

the loan. If this does not get resolved in the next month or so," we should adjust the Bank's coding for this loan.

- On September 8, 2016, Matter stated as to one of the RRM Associates, LLC loans, "I think by next week we should have a better idea of what is going on between the Donatucci's and Meghan kline[(sp) ](the executor of Michael's estate). Hopefully, if all goes well we can get our change in terms document signed."

171.   Despite the Bank, through Matter, reporting repeatedly in its internal paper trail that it was working with the "Estate" and its "executor," Matter did not reach out to the Estate (its counsel *or* its Executrix) until September 12, 2016, *two months after Michael passed*.

172.   The Bank deliberately delayed accepting the Executrix's payments and did not accept her payments until September 16, 2016, after the Bank, through Matter, informed Meghan that the loan was in default for nonpayment of installments due, *despite the Bank's knowledge of Meghan's prior efforts to make the payments* just as they were required to be made.

173.   On September 18, 2016, Meghan and Donatucci met independent of their lawyers (at the request of Meghan in hopes that matters could be resolved amicably) and at that time Donatucci offered to pay Meghan a nominal sum over an extended period of time for all of Michael's Commonly-Held Realty Interests and the two properties in which Donatucci had no interest, i.e., the Girard Avenue Property (which belonged to the LLC, Penn Peak) and Michael's 20th Street Property (which Michael owned outright). Donatucci's proposal was also contingent on Meghan allowing him to take over as executor of Michael's Estate, so that, among other things (including controlling information and things of the Estate), he could cheat his ex-wife out of her inheritance and erase the debt owed to the Michael (now the Estate) by his other son, Donatucci,

Jr.  Donatucci expressed anger that Michael had left his interests in the properties to Meghan and his mother, Donatucci's ex-wife, rather than to himself.

174.    Donatucci's offer not only severely undervalued Michael's Commonly-Held Realty Interests—which were determined to have a net value of close to $2 million by Michael, who was extremely proficient in real estate valuation—but also substantially undervalued the Girard Avenue and 20th Street Properties.

175.    Various iterations of Donatucci's demands were repeated in calls and writings by Mannion and Golden, who later claimed the Commonly-Held Realty Interests were worth a "negative value".  Despite holding a City job under Donatucci, Golden purported to represent Foglietta in negotiations relating to the Estate's real estate holdings.  By arranging for Golden to represent Foglietta, Donatucci used his office to install a friendly advocate for Foglietta, and he used him pressure Meghan to accept his demands. And indeed, Foglietta indicated in the negotiations, through Golden, that she supported Donatucci's demands. She was evidently unaware at the time that her ex-husband had tried to cheat her out of her inheritance before engaging her in his ploy.  Donatucci, with the participation of Mannion, Golden, DeSimone, and Donatucci, Jr., lured and made Foglietta a willing participant in their scheme by providing her with a luxurious condominium in which to live in Philadelphia (when she returned from California) rent free.  The Estate holds an interest in that condominium. Since Michael's death, Donatucci, through Mannion, has refused to pay the Estate its share of the rents on Michael's Commonly-Held Realty Interests.

176.    Because Donatucci, on his own and through Mannion and Golden, was unable strike a deal for himself with Meghan, Donatucci (with the help of Mannion) solicited additional support from WSFS, as well as support from Brimfield/Siu (who Donatucci falsely promised

would continue to be involved in the development of the Girard Avenue Property, though to what extent was not been disclosed to Meghan), and DeSimone (to help Golden control Foglietta) in furtherance of his scheme to take over the Girard Avenue Property, and ultimately the Estate. Both WSFS, Brimfield/Siu, and Foglietta (and their counsel) were willing to oblige in order to curry favor with Donatucci for their own economic advantage.

177.    WSFS's delaying accepting Meghan's payments until September 16, 2016, while intended to give time to Donatucci to get his deal done, was not enough.

178.    After Meghan confronted WSFS about its improper refusal to receive her payments, WSFS finally accepted the payments, and WSFS led Meghan to believe there were no other issues with the loan nor would there be if Meghan continued making payments by the 25th day of each month to keep the loan current pending her disposition of the Property (as Meghan and Brimfield/Siu agreed), i.e., the same monthly payments Michael had made before his demise. These were the terms the Bank told Meghan would apply to the loan, and on which she reasonably relied. The terms required by the Bank were met in good faith each month by Meghan since Michael's passing and through the date she ultimately sold the property in November 2017 pursuant to a Court Order of the Court of Common Pleas of Chester County and with the help of an Injunction Order from that same Court against Donatucci, WSFS, and Brimfield/Siu.

179.    Unbeknownst to Meghan, Brimfield/Siu and the Bank were both working *against* her, and this agreement in September 2016 was only part of a broader, ongoing scheme for Donatucci to take over the Property.

180.    As Executrix, Meghan paid and continued to pay 100% of all outstanding debts on behalf of Penn Peak, including mortgage payments to the Bank, property and liability insurance, real estate taxes, utilities, building maintenance, and professional fees, even though Michael was

not the 100% owner.  Consistent with Donatucci's scheme, in order to put financial pressure on Meghan, the minority member in Penn Peak, Brimfield/Siu, contributed no funds since Michael's passing to the expenses of the Property it owed based on its minority share in Penn Peak.

181.    As part of his intimidation efforts surrounding the Girard Avenue Property, Donatucci sought to deliberately create a false sense of urgency around alleged safety conditions at the Property. This was intended to be a means of pressuring the Estate to sell to Donatucci. When Meghan did not meet Donatucci's demands, Donatucci leveraged this manufactured "urgency" against Meghan in attempt to rid Meghan of her interest in the Property by having WSFS attempt to improperly call the loan. Based on information and belief, Donatucci also used surveillance taken from a nearby property occupied by Philadelphia Police, with their cooperation, to keep tabs on Meghan's efforts to sell the Property and attempt to meddle.

182.    Donatucci, through Mannion, and Golden and DeSimone (who were controlling Foglietta for Donatucci), alleged that the Property was in a "terribly dangerous and unsafe condition" and threatened that insurance on the Property (through his insurance broker, William Kramer, also on the Philadelphia Board of L&I) would not be renewed. These allegations proved to be entirely false.  In reality, the sense of urgency was that Donatucci knew Meghan was trying to sell the Girard Avenue Property, which would have eliminated his ability to buy at below market price.  For this reason, his only options (he believed) were to either intimidate Meghan to sell it to him or bring about a foreclosure sale.

183.    Meghan only wished to follow Michael's wishes as he so carefully detailed in his Will.  Yet Donatucci made it virtually impossible for Meghan to consider his offers, as they not only undervalued the Girard Avenue Property but they were always attached to other contingencies, including Meghan resigning as Executrix to allow Donatucci to become the

executor and Meghan's relinquishing her (and Michael's mother's) interests in the Commonly-Held Realty Interests, among other things, for instance releasing Donatucci, Jr. of his debt owed to Michael, and now to the Estate. Further, Donatucci refused to turn over the items, information, and things that he took from the Estate, including but not limited to personal items of Michael's as well as Michael's cell phone and email accounts.

184.    Unbeknownst to Meghan, Donatucci and WSFS were continuing to communicate behind her back to set up the scenario for the Bank to attempt to call the loan, extinguish Meghan's interest in the Girard Avenue Property, and transfer the Property to Donatucci.

185.    Based on information and belief, Donatucci and Matter of WSFS spoke in and around November 14 and 16, 2016 about the particulars of the scheme.

186.    Meanwhile, on information and belief, between November 14-17, 2016, Donatucci, Mannion, Gillin, Golden, and Siu were all in touch regarding the scheme involving Matter and the Bank, and were having discussions about ways to remove Meghan as Executrix and replace her with Donatucci, unbeknownst to Meghan.  On information and belief, DeSimone and Foglietta were also privy to and/or part of these discussions.

187.    Pursuant to Donatucci's instructions, on November 15, 2016, WSFS contacted Meghan to tell her the insurance was due to expire at the end of the month and that the Bank needed to see evidence that Meghan would renew. The Bank also told her that it had "some real concerns" with the condition of the Property pursuant to photographs they had allegedly seen, which Meghan later learned were taken by Donatucci and sent by him to the Bank.

188.    Meghan's counsel at the time, Mr. Lipow, in reply, asked to see the photos and confirmed that insurance was being renewed. In fact, there was never any lapse in the insurance

coverage and the coverage was maintained by Meghan without any difficulty. The Bank refused to share the photos.

189.    Days later, on November 18, 2016 (by letter dated November 17, 2016), WSFS threatened to call the loan on the pretense of Michael's passing (4 months prior) under a due on death provision in the mortgage note.  WSFS now claims it actually called the loan on November 18, 2016, in order to allegedly support its demand to Meghan for payment of the Bank's attorney's fees and legal expenses it apparently incurred as a result of its participation in Donatucci's scheme. However, as noted above, in September 2016, Matter on behalf of WSFS had agreed, of his own volition, that the loan would not be in default as long as Meghan kept the mortgage and insurance payments current pending her disposition of the Property.  This agreement by WSFS had been confirmed by phone and in an email from Matter to Meghan on September 20, 2016, and was reinforced in follow up communication. In accordance with the agreement, Meghan made timely payments to WSFS each month and the loan, taxes, and insurance on the Property were kept current at all times.

190.    Despite Lipow's pushing back on WSFS's improper actions in light of WSFS's prior agreement with Meghan, WSFS maintained its new position in concert with Donatucci and demanded an inspection of the property. On November 25, 2016, WSFS's engineer, J. Jeffrey Grant, MSCE, MBA, of GAC Associates, Inc., inspected the Girard Avenue Property and determined it to be structurally sound and secure. This determination by the engineer was completely at odds with Donatucci's and Mannion's self-serving and baseless allegations that the Property was in a "terribly dangerous and unsafe condition" and that insurance on the Property would not be renewed.

191.    Meanwhile, Donatucci continued his relentless pursuit of ownership of the Girard Avenue Property.  On December 19, 2016, through Mannion he informed Meghan that "Tony Siu [(the minority partner)] is represented by Rich Mulcahey, who is ready to engage in discussions" about the Girard Avenue Property.  Mulcahey is with the law firm Schubert, Gallagher, Tyler and Mulcahey in Philadelphia, to which, on information and belief, Donatucci provides appointments through his Register of Wills' Office.  At about this time, the Bank demanded a meeting with Meghan.

192.    On December 21, 2016, Meghan, who had been trying to sell the Property pursuant to her agreement with the Bank, met with a prospective buyer, Don Ventresca, at the Girard Avenue Property. When they met, Ventresca, who appeared to be unaware the Property was owned by a "Donatucci," stated that Donatucci "takes care of all my zoning and permits" for Ventresca's real estate development business. While Ventresca showed interest in the Property, having made a low-value verbal offer, he abruptly stopped communicating with Meghan after she insisted she needed to be at the Property for all showings and would not turn over the lockbox code to him and his associate, Tom Citro, as he had requested.

193.    On January 6, 2017, at the demand of WSFS, Meghan met with WSFS's counsel, Phillip Berger, and Amy Erickson, an assistant vice president of WSFS.  Despite Meghan's and her mother's (who attended with Meghan) attempts to share with WSFS's representative and counsel what had occurred, including the Bank's improper actions, the meeting was used by WSFS to threaten Meghan and her mother with additional costs, foreclosure, and a judgment by confession against Meghan, and to demand that Meghan turn over the names of the prospective buyers with whom Meghan had been communicating.  This was concerning because Meghan justifiably believed that Donatucci could retaliate against the prospective buyers if they purchased

the Property, by using his influence, by virtue of his patronage empire (and through his son, Donatucci, Jr., also a real estate developer and currently a member of the L&I Board), over land use decisions to torpedo zoning and permit applications on the buyer's other projects in the City.

194.    On January 25, 2017, Meghan's litigation counsel, Robert Feltoon, Esquire of Conrad O'Brien, PC ("Feltoon") sent a letter to the Bank pointing out Donatucci's meddling in conjunction with the Bank's sudden change in tenor since agreeing to accept Meghan's payments in September 2016.

195.    Meanwhile, Donatucci was still pressing to obtain the Property. On February 10, 2017, after speaking with the Bank, Mannion contacted Feltoon and conveyed Donatucci's continued interest in the Girard Avenue Property. Mannion said Donatucci wanted access to the Property and planned to get into the building through Siu.

196.    Thereafter, on information and belief, in coordination with Donatucci who was in need of time to get a deal done, on February 16, 2017, the Bank sent Meghan a letter allegedly allowing her time to sell the Property as long as monthly payments were being made to WSFS when due and all insurance on the Property remained current and all real estate taxes remained paid and current.  Unbeknownst to Meghan, the Bank (who had been in contact with Donatucci, Donatucci, Jr., and the minority partner) only gave her that time to allow Donatucci to obtain the Property.

### 3.    Donatucci Thwarts Meghan's Sale of the Property in a Further Effort to Save it for Himself

197.    On March 11, 2017, Meghan obtained a signed Agreement of Sale from a buyer for a $460,000 cash sale of the Girard Avenue Property ("Cash Sale"). That same day Meghan sent the Agreement of Sale to Siu whose consent to the sale was required under the Penn Peak Operating Agreement.

198.    At that time, Meghan was unaware that Donatucci, Mannion, and Siu, and Siu's counsel, Mulcahey, had planned (on information and belief) to sabotage any sale other than to Donatucci, in coordination with WSFS.

199.    Donatucci, who was aware of the Cash Sale buyer from Siu, was continuing to press for access to the Property, alleging his low-ball offer (attached to contingencies) was a result of structural issues with the Property, which was false, and that he allegedly needed to inspect it. Donatucci, who was already very familiar with the Property, having accessed it on at least several occasions following Michael's passing through the minority partner, Siu, without Meghan's knowledge or consent, was well aware of the Property's condition, including that it had no structural issues.

200.    At the same time, on March 15, 2017, out of nowhere, without having objected to any of the terms of the Agreement of Sale or having objected to the price (as it would have only made it more expensive for Donatucci to outbid the Cash Sale buyer), Siu demanded that he be guaranteed to receive payment of $50,000 if he approved the Cash Sale, far more than he would have been entitled to under the Operating Agreement for Penn Peak.

201.    On March 17, 2017, Siu's counsel, Mulcahey, who on information and belief was closely working with Donatucci and Mannion as part of the scheme (which also included WSFS, Donatucci, Jr., Golden, DeSimone, and Foglietta), added a demand that a judgment lien in favor of Siu be recorded against the Girard Avenue Property and stated, in regard to paying the mortgage and the possibility of foreclosure, "I am sure you know that your client has more to lose than mine."

202.    On March 21, 2017, Mulcahey, who obtained the name of the Cash Sale buyer from the Agreement of Sale, reached out to the broker for the Cash Sale buyer without any notice to Meghan.

203.    On March 21, 2017, in an effort to avoid greater loss through foreclosure, Meghan agreed to include language in the Agreement of Sale of the Cash Sale, confirming Siu would be paid $50,000 at the closing.

204.    In response, on that same day, Mulcahey changed Siu's demand to require a *lis pendens,* which was entirely unnecessary (and also not authorized by the loan documents and would cloud title) since Meghan had already promised Sui would receive $50,000 at the closing table before title passed to the Cash Sale buyer, and also agreed to include Siu's $50,000 demand in the Agreement of Sale.  Meghan rejected the demand for a *lis pendens* and on March 22, 2017, Mulcahey, on behalf of Brimfield/Siu, flatly refused to consent to the Cash Sale.  In concert with Donatucci (as well as Mannion, Donatucci, Jr., Golden, DeSimone, Foglietta, and WSFS, who were part of the scheme), Siu and Brimfield continued to withhold consent to the Cash Sale, and, as a result, the Cash Sale fell through.

### 4.    Donatucci Uses His Subordinate at the Register of Wills to Press for Sale of the Girard Avenue Property to Him

205.    After the Cash Sale fell through, on April 6, 2017 Donatucci again swooped in to continue to pressure Meghan into selling the Girard Avenue Property at a low-ball price.

206.    Significantly, at no time did Donatucci ever offer market value for the Girard Avenue Property, nor did he ever even make a stand-alone offer, i.e., an offer not attached to what he called a "global resolution" of the Estate, including Michael's Commonly-Held Realty Interests, among other things, including refusing to turn over items he took from the Estate, significantly Michael's phone.

207.    On April 14, 2017, out of nowhere, WSFS demanded that Meghan disclose her efforts to sell the Girard Avenue Property.  WSFS's letter came within several days of Meghan receiving letters from Golden on behalf of Foglietta but in substance on behalf of Donatucci, and from PNC Bank, also closely connected to Donatucci (including through Donatucci's good friend, Salvatore Patti, PNC's senior vice president of commercial banking).  As set forth below, this correspondence was meant to pressure Meghan to sell the Estate's realty interests (not just in the Girard Avenue Property) to Donatucci quickly and for a cheap price.  Based on information and belief, Donatucci was in communication with both PNC and his Solicitor, and directed the communications be sent.

208.    Solicitor Golden's, letter demanded Meghan "promptly liquidate the real estate interests," *i.e.*, accept Donatucci's offer for the Girard Avenue Property and Michael's Commonly-Held Realty Interests, among other things.  Such a demand was puzzling coming from Donatucci's subordinate employee Golden.  Based on information and belief, Golden was doing the bidding for his boss, Donatucci, at the expense Foglietta, who, Donatucci directed Golden to also represent to carry out his scheme.

209.    On April 21, 2017, Meghan contacted the Cash Sale buyer to see if it could increase its offer for the Girard Avenue Property, in an attempt to salvage the deal and get Brimfield/Siu on board. Talks continued thereafter until it became apparent that the buyer's position was not changing because, in the buyer's view, Brimfield/Siu (who, on information and belief, were acting in accordance with Donatucci's scheme and/or at his urging) was being unreasonable.

210.    Thus, Meghan's effort to sell the Girard Avenue Property came to a standstill:

- The Cash Sale buyer was lost due to Donatucci's elaborate scheme with Brimfield/Siu and the Bank, among others, and

- Meghan was unwilling and unable (as an Executrix with fiduciary obligations) to sell to Donatucci in view of his refusal to offer a competitive price and his refusal to make a stand-alone offer (i.e., one not attached to numerous contingencies completely unrelated to the Girard Avenue Property).

211.    In an effort to break the impasse and advance her efforts to sell the Girard Avenue Property at market value, on June 30, 2017, Meghan filed a Complaint against Brimfield and Siu (for the purpose of obtaining sole authority to sell the Property and wind up and dissolve Penn Peak) in the Court of Common Pleas of Chester County under Docket No. 17-06631-MJ (the "Penn Peak Dissolution Case").  Thereafter, on July 11, 2017, Meghan filed a Petition seeking judicial dissolution of Penn Peak in the Penn Peak Dissolution Case and a hearing on that Petition was scheduled for August 18, 2017.

212.    Siu's testimony at those proceedings confirm that he rejected the sale because he was in fact working with both Donatucci and the Bank, stating:

- "[…] Ron Donatucci, Sr., he has expressed [interest] in buying out Meghan's interest and he would be in a perfect condition to develop the property."

- "[Michael's] family [i.e., Donatucci and Donatucci, Jr.] has connection with the [B]ank […]."

- "[…] the foreclosure [that WSFS was threatening] is not like as imminent as they're trying to make it […]."

213.    On August 23, 2017, the Court of Common Pleas of Chester County entered an Order granting judicial dissolution of Penn Peak and authorizing Meghan alone (without the

minority member's consent) to sell Penn Peak's sole real estate asset, the Girard Avenue Property, and pay off WSFS and other creditors of Penn Peak.

214. Despite that this order should have ended Donatucci's pursuit of the Girard Avenue Property once and for all, Donatucci's efforts to gain control of the Property did not stop there— so much so that the state court issued an injunction in a new case Meghan was forced to file against Donatucci and his helpers, *Estate of Michael P. Donatucci v. Wilmington Savings Fund Society, FSB et al.* in the Court of Common Pleas of Chester County, Docket No. 17-08494-TT (the "Chester County Action"). Specifically, on August 31, 2017, the injunction (i) restrained Donatucci, WSFS, and Brimfield/Siu from, *inter alia*, further interference with the Girard Avenue Property, in which Donatucci had no interest but was trying to obtain for himself, and (ii) prohibited WSFS from calling or accelerating the loan or exercising any rights under its loan documents against Meghan and the Estate. At a subsequent hearing in the Chester County Action on September 18, 2017, Donatucci arrived at the courtroom accompanied by an entourage of his subordinate City employees.

## F. **AT ALL TIMES DONATUCCI ENGAGED IN A PATTERN OF INTIMIDATING AND HARASSING CONDUCT AND DIRECTED CITY AND STATE EMPLOYEES TO DO SO ON HIS BEHALF, IN HIS EFFORT TO GAIN CONTROL OF THE ESTATE**

215. Donatucci's *modus operandi* for getting what he wanted from Meghan—control of the Estate (and its information) and relinquishment of Michael's real estate interests—included resorting to bullying, intimidating, and threatening Meghan, her counsel, and her parents. His actions led Meghan to grow increasingly concerned over time for her safety and that of her family. Donatucci bullied, intimidated, and delivered threats by drawing on the power he derived from his nearly four decades of doling out patronage jobs, which gave him the ability to seek favors whenever he needed them.

1.      **Donatucci Enlisted Law Enforcement and City Employees to Intimidate Meghan**

216.    Donatucci enlisted a former FBI agent, Dave Gentile, to call a senior member of the Conrad O'Brien law firm (the "Conrad Firm") on March 1, 2017, stating that he was calling at the direction of Donatucci to deliver Donatucci's threat that the firm's reputation would be harmed if the firm continued to represent Meghan. This threat caused severe emotional stress to Meghan and her family.

217.    Mannion likewise interfered with Meghan's representation by hiring the Conrad Firm to represent him in another matter (without disclosure), shortly after the threat was made by Donatucci.

218.    In fact, the Conrad Firm abruptly withdrew from representing Meghan in early 2018, due to Donatucci's and Mannion's threats and interference.  As the Conrad Firm had been representing the Estate in various matters, including a slip and fall case, the Penn Peak Dissolution Case, the Will Contest and Removal Petition, and the Chester County litigation (as described above), its withdrawal was very detrimental to Meghan.  This threat was able to be delivered by Donatucci solely because of his state power as a judicial official and employee of the City.  Unlike any other threat of this kind, Donatucci has the state power to harm a law firm's reputation because he is uniquely situated and permitted such power by the state government.

219.    Just prior to the threat against the Conrad Firm, in January 2017, Donatucci also directed his staff at the Register of Wills to follow Meghan's brother-in-law into a center city coffee shop, where Donatucci's handmaidens on the City payroll cornered her brother-in-law and his colleague until Donatucci arrived to deliver a message for Meghan regarding settlement of the Estate.

220.    Following Donatucci's threat to Meghan's counsel, the Conrad Firm, Donatucci and Mannion even used proceedings in the *McGarry Estate* (in which the Conrad Firm was representing Meghan's father) to attempt to further undermine and cause harm to Michael's Estate, including both Meghan and her father, by attending a hearing to obtain privileged information regarding the Firm's receipt of the aforementioned threat and its effects on the Estate. On information and belief, Donatucci influenced the outcome of those proceedings. *See* transcript of June 11, 2018 hearing at 19:6 – 21:21, 47:6-7, attached as **"Exhibit F";** letter from Judge Carrafiello dated November 27, 2018, together with an Order of the Superior Court dated November 19, 2018 and related acknowledgements of receipt of that Order signed by Judge Carrafiello and Judge Sarmina, attached as **"Exhibit G"**; letter from President Judge Fox dated December 14, 2018, attached as **"Exhibit H"**.

### 2.    Donatucci, Donatucci, Jr., Golden, Mannion, DeSimone, and Foglietta Sought to Emotionally Manipulate and Bully Meghan, including through Donatucci's connections to a City News Outlet

221.    Donatucci, Donatucci, Jr., Golden, Mannion, DeSimone, and Foglietta used emotional warfare and intimidation tactics against Meghan in an effort to debilitate her in performing her duties as Executrix.

222.    In an email dated June 17, 2017, Donatucci and Mannion blamed Meghan for Michael's death and stated that she would be forced to "re-liv[e] these terrible events" if she did not accept their demands.  Mannion also again threatened at that time to further deplete Meghan's finances with a Will Contest if she did not agree to Donatucci's demands (which, as discussed below, he did indeed later file but ultimately withdrew because it was brought improperly and without basis, to serve only as a means to extort Meghan).

223.    On July 3, 2017, Donatucci was quoted in the Philadelphia Inquirer, stating that Michael took his own life because "he was afraid to get married," and raised the highly publicized *Carter* case involving a young woman accused (and since the date of the article, convicted) of encouraging her boyfriend to commit suicide as though it were relevant to his son's death.  The only reason a newspaper would be interested in such quotes from Donatucci is because of his high public profile as an elected official.  These statements by Donatucci were intended to bully and intimidate Meghan.

224.    Foglietta, who evidently made the decision to align with Donatucci—he not only set her up with counsel but also a place to live as noted above—has been retaliating significantly against the Estate at Donatucci's direction.

225.    Similar to Donatucci, Foglietta has exhibited a pattern of harassment and threats against Meghan, in Foglietta's case through emails, letters, and text and public Facebook messages, all of which were likewise intended to intimidate and disparage Meghan and many of which aligned with the timing of demands and/or threats of Donatucci, Golden, Mannion, and DeSimone, in which, on information and belief, Donatucci, Jr. is also behind.

   **3.**  **Donatucci used His Orphans' Court to File a Baseless Retaliatory and Malicious Will Contest and Removal Petition to Extort the Estate in an Attempt to Wear Down the Estate Financially (by Driving up its Legal Fees) and Intimidate Meghan into Relinquishing Her Position as Executrix to Him so that He Could Gain Control of the Estate and its Assets**

226.    On July 19, 2017, the first anniversary of Michael's birthday since his passing, angered by Meghan's institution of the Penn Peak Dissolution Case (Donatucci was not a party to that action but only the later Chester County Action of August 31, 2017) and her refusal to sell the Estate's realty interests to him for a low price and relinquish her role as Executrix to him (among other contingencies) and because Donatucci's other tactics had not yet delivered him the results

he was looking for, Donatucci, through his life-long friend DeSimone, retaliated against Meghan by directing DeSimone to file a petition to remove Meghan as Executrix and replace her with himself (the "Removal Petition").

227.    Based on information and belief, Donatucci had initially planned to file the petition through Mannion.  In fact, it has been discovered that he was planning to file his petition as early as the beginning of November 2016 (within just months of the probate) when his scheme with the Bank to obtain the Girard Avenue Property was underway, but because Donatucci is not a beneficiary under Michael's Will, Donatucci lacked standing to raise any of the issues in the petition to remove Meghan.  Thus, he had his friend DeSimone (who had been working behind the scenes to advance Donatucci's scheme early on) file the Removal Petition in the name of Donatucci's ex-wife, Foglietta.

228.    While Golden remained involved, Donatucci had DeSimone be the face of the filing and file the Petition to avoid the obvious bad optics of having his City employee (Solicitor Golden) do so.

229.    Donatucci used the Removal Petition to allege primarily that Meghan was not carrying out her fiduciary duties in regard to Penn Peak and the Girard Avenue Property.  This was the focus of the Petition.  Nothing could have been farther from the truth, as was shown, for example, at the August 18, 2017 hearing in the Penn Peak Dissolution Case in Chester County, which, as noted above resulted in the court awarding Meghan full authority to dispose of the Girard Avenue Property.

230.    On August 4, 2017, Donatucci through Mannion, also filed his previously threatened will contest in his Orphans' Court (the "Will Contest").  This case was an appeal by Donatucci from *his own decision* as a judicial officer admitting Michael's Will to probate a year

prior.  Under Pennsylvania law, the admission of a Will to probate by the Register of Wills is a judicial decision. *See, e.g., Mangold v. Neuman*, 371 Pa. 496, 498, 91 A.2d 904, 905 (1952). Despite that there were no arguable grounds for the Will Contest and Donatucci was not even a beneficiary of Michael's Will (or alleged prior will, thus he lacked standing), four days later, Donatucci's personal friend and decades-long colleague, Administrative Judge of the Orphans' Court Division, Matthew Carrafiello, ordered the issuance of a Citation to Meghan, directing her to show cause why Donatucci's Will Contest should not be sustained. Judge Carrafiello was also presiding over the Removal Petition and also issued a similar Citation to Meghan with respect to the Removal Petition.

231.    Donatucci's use of the Will Contest and Removal Petition as an extortion tactic was twofold.  First, through the Will Contest, he threatened to become a beneficiary as an intestate heir of the Estate, which as noted owned valuable real estate interests.  He was attempting to take for himself what Michael left his fiancée and his mother. Second, through the Removal Petition he threatened to gain control of the Estate.  If the Removal Petition was successful, Meghan would be removed as Executrix and replaced by Donatucci, under a provision of Michael's Will naming Donatucci as the contingent executor. Donatucci would thereby take control of the Estate's assets, giving him control not only of the disposition of Michael's Commonly-Held Realty Interests (to the rightful beneficiaries, Meghan's and Michael's mother's, detriment) but also control of all information and things of the Estate, including Michael's phone and email accounts, among other things he kept from police and from Meghan.

232.    The Will Contest and Removal Petition were served together, as discussed below.

a. **Donatucci Uses Service as a Pretext for Using Pennsylvania State Employees to Threaten and Intimidate Meghan and Her Parents and Show He Knows Her Every Move**

233.    Donatucci enlisted Pennsylvania state employees to threaten and intimidate Meghan's parents, as a way of sending a message to Meghan.

234.    On Sunday August 13, 2017, a non-business day and before the court decided the Penn Peak Dissolution Case, a Pennsylvania State Constable, Joseph C. Valerio, appeared at Meghan's parents' home, purportedly to attempt to serve Meghan with the Removal Petition and Will Contest petitions. The Constable left several business cards with a threatening message on the front and back doors of Meghan's parents' residence in Lafayette Hill, as well as on the cars on the driveway of the property. The threat had nothing to do with the purported service, and read:

> "A warrant for your arrest may be issued which may lead to your incarceration. Call my office immediately for information on how to resolve this matter."

235.    This alarming warning to Meghan and her parents had absolutely no basis in fact or law. It was made for intimidation purposes only.

236.    State Constables have a long history of corruption and criminal activity. Many have been prosecuted and convicted for offenses relating to abuses of their office, including fraud, theft, impersonating a police officer, and raw abuses of power such as conducting evictions without a hearing, searching a house without a warrant, and knowingly continuing to handcuff the wrong person.[1]

237.    The next day, Monday August 14, 2017, Mannion confirmed that he and Donatucci had sent the Constable the day before.  On information and belief, the Constables were sent by Donatucci, Donatucci, Jr., Golden, Mannion, DeSimone, and Foglietta.  Since there are no

---

[1]    *See* https://en.wikipedia.org/wiki/Pennsylvania_State_Constables (last visited June 27, 2019).

Constables for the City of Philadelphia, Donatucci made a calculated decision to enlist a Constable from outside the City, who as a uniformed officer would look more threatening than a private process server. Although Mannion let on to Meghan's counsel that he wished to resume discussions, the ensuing actions of Donatucci, Golden, Mannion, DeSimone, and Foglietta, supported also by Donatucci, Jr., ran counter to that.

238.    In the next several days, Donatucci and Mannion, who were dissatisfied that Meghan was proceeding with her petition in the Dissolution Case, which had been scheduled for a hearing on August 18, 2017, decided to get interfere with those proceedings. On information and belief, they fed opposing counsel in the Dissolution Case (for Brimfield/Siu) lines of questioning to use in cross examination of Meghan at the hearing, including regarding the Removal Petition and Michael's Will. Opposing counsel in the Dissolution case would have no way of knowing such information except from Donatucci and Mannion (or from Donatucci, Jr., Golden, DeSimone, and Foglietta). In fact, *neither the Will Contest nor the Removal Petition had even been served upon Meghan yet*.

239.    Apparently unhappy with the proceedings and Meghan's testimony on August 18, Donatucci, Donatucci, Jr., Golden, Mannion, DeSimone, and Foglietta set out to retaliate on the evening following the hearing, unbeknownst to Meghan, by sending the Constable (undercover this time) to Meghan's best friend's wedding to attempt to serve Meghan with the Will Contest and Removal Petition *at the wedding.*

240.    The Constable came to the wedding dressed to blend in with the guests in order to gain access, and he lurked around the various wedding locations, including Old St. Mary's Church in Philadelphia, the Loews Hotel, and the Crystal Team Room in Philadelphia.  While this attempt to hurt Meghan failed, Donatucci, Donatucci, Jr., Golden, Mannion, DeSimone, and Foglietta's

actions unfairly disrupted and distracted the bride and her family and friends who had noticed the uninvited Constable and out of concern for Meghan shielded her from his continued pursuit of her that evening, unbeknownst to Meghan.

241.   Clearly, this was a deliberate attempt to cause Meghan severe emotional distress. Donatucci, Donatucci, Jr., Golden, Mannion, DeSimone, and Foglietta were not done, as they tried again.   Donatucci, Donatucci, Jr., Golden, Mannion, DeSimone, and Foglietta dispatched Constables to return to Meghan's parents' home the following week.   On the evening of August 22, 2017, Donatucci sent several Constables—at least two of whom were visibly armed—to Meghan's parents' residence in Lafayette Hill as if they were there to make an arrest, yelling and banging loudly on the front and back doors as well as windows at the kitchen at the rear of the home.   Meghan's mother was sitting in the kitchen felt very threatened by the Constables. Such behavior was not necessary to effectuate service and was for intimidation purposes only.

242.   The Constables inquired as to whether Meghan was "at the gym," insisted that they wait for her to arrive at her parents' house to serve her.   They refused to leave the papers with Meghan's mother or speak with Meghan's lawyer by phone who wished to confirm acceptance of service via Meghan's mother.

243.   Because of the Constables' actions, police officers arrived at the scene and required the three Constables, who were not from the area, to leave the premises. At that point one of the Constables handed Meghan's mother the Will Contest and the Removal Petition and demanded she sign for them. This scene could only have been intended as an intimidation tactic by Donatucci, Donatucci, Jr., Golden, Mannion, DeSimone, and Foglietta, to frighten, pressure and embarrass Meghan and her family in front of neighbors and friends in their quiet neighborhood.

**b.** **The Will Contest and the Removal Petition are Proven to be a Sham**

244.    Despite initiating the Orphans' Court proceedings, Donatucci, Donatucci, Jr., Golden, Mannion, DeSimone, and Foglietta were entirely uncooperative throughout those proceedings, and it became obvious to Meghan, and ultimately the Court, including for the reasons set forth herein, that they were using the litigation to improperly advance their own hidden agenda rather than to pursue legitimate claims.   They twice obtained stays of the proceedings, including based on a false promises to Judge Nagle and Meghan that Donatucci would turn over everything he and others at his direction (as set forth above) had taken from Meghan and the Estate, including Michael's phone and email accounts and other records and things which he, Stephanie Donatucci, Donatucci, Jr., Golden, Mannion, DeSimone, and Foglietta and others at Donatucci's direction had purposefully been withholding to set Meghan up to be removed and replaced by Donatucci for allegedly not doing her job as Executrix, which was a lie.   The stays were used by them only to continue the scheme to unfairly leverage and attempt to extort a deal for their own benefit as well as block Meghan from the information she could have otherwise had the ability to obtain in discovery, while attempting to conceal their conduct from the public.

245.    Significantly, public access to the Philadelphia Orphans' Court docket online, which docket Donatucci controls in his capacity as Register of Wills and Orphans' Court Clerk, has been off line and unavailable for a significant period of time.

**i.** **Donatucci has His Employee, Solicitor Golden, Obtain Foglietta's Acquiescence in Filing the Removal Petition Though it is at Odds with Foglietta's Financial Interests**

246.    It has been discovered that Donatucci and Mannion initially planned to file the Removal Petition themselves (as far back as November 2016 in coordination with Donatucci, Jr.,

Foglietta, Solicitor Golden and DeSimone and the scheme to take over the Girard Avenue Property). Donatucci and Mannion actually drafted and prepared the Removal Petition, and they sent it to Solicitor Golden and DeSimone to be filed (it was not filed until July 2017, but drafts indicate it was also being considered in January 2017, again in coordination with the scheme with WSFS).

247.   Indeed, Foglietta admitted in pleadings filed in the Orphans' Court that she has no firsthand knowledge of many of the facts alleged in the Removal Petition filed in her name by Donatucci in coordination with Mannion, DeSimone, Golden, and Donatucci, Jr.   And the allegations themselves are at odds with her financial interests: As a potential seller of her share of the co-owned real estate, it is not in Foglietta's personal interest to embrace the position that the property interests she shares with Meghan are "illiquid, non-marketable private interests, which are not readily salable." The only person who benefits from such claims is the person trying to buy the real estate well under open market values:  Donatucci.

248.   Despite recognizing this, writing last summer in a text to Meghan's father that Donatucci "is my ex and not looking after my interests. I know that," Foglietta has remained complicit in Donatucci's scheme and has failed to withdraw her fraudulent petition.

ii.   **Donatucci's Will Contest Filing is Proven to be yet Another Baseless Threat**

249.   In the Will Contest, Donatucci claimed that Michael "had a long history of anxiety and depression" and, for that reason, he lacked testamentary capacity. This alleged history (which is assumed here, *arguendo*, only) then would have been known to Donatucci when he admitted Michael's Will to probate and granted Letters Testamentary to Meghan.  Donatucci's Will Contest also mentioned an alleged prior will—in which Meghan was the sole beneficiary—which Donatucci was also aware of at the time of probate.

250.     Donatucci was not only aware of Michael's alleged history as well as fully aware of that alleged prior will, but as mentioned, he even consulted Mannion, Gillin, and based on information and belief, Golden and DeSimone, prior to probating Michael's Will.

251.     Donatucci's basis for his Will Contest was entirely without merit and he and the various counsel with extensive experience in probate and estates law, as well as Golden, DeSimone, Foglietta, and Donatucci, Jr., were all aware of this (including that Donatucci had no standing) when Donatucci and Mannion threatened to file it early on and continued with their threat more than a year after Michael died.

252.     In fact, Foglietta, Donatucci, Jr., Mannion, DeSimone, and Golden were all in on advancing the threat of the Will Contest as part of Donatucci's scheme, as it was not only served with the Removal Petition, but no opposition (or even response) was filed for Foglietta opposing the Will Contest, despite the fact that her interests were far better served under the probated Will.

253.     For these reasons and those stated above, including in the Introduction, Donatucci, Donatucci, Jr., Golden, Mannion, DeSimone, and Foglietta participated in the filing of the Will Contest in bad faith and only to advance the scheme. It was their last ditch effort to extort Meghan as Executrix of the Estate.

254.     In fact, Donatucci's position made no sense and has been repeatedly contradicted by Donatucci himself, who, for instance, boasted to friends and family on the days following Michael's death about his son's impressive presentation that he made on the day he passed to the Philadelphia Pension Fund's Board as Chief Investment Officer.

255.     Also, on July 18, 2016, WHYY reported that Mayor Kenney, who was at the Donatucci home on Sunday following Michael's passing, stated:

> [Michael] [was] a good kid, very smart, actually [only weeks earlier] he saved us millions of dollars by exiting investments before Brexit hit, he had the foresight

and understanding.  He saw Brexit was coming and he got our money out of areas that were at risk [. . .]

256.    And, Donatucci, Jr. has stated in his recorded presentation as president and co-founder of the Michael P. Donatucci Foundation, Inc., entitled "Bouncing Back: Anxiety and Depression", a copy of which is found at https://vimeo.com,

> So the city of Philadelphia had a pension fund officer position opened and it was the #2 position and when he went for the interview they were so impressed with him that they offered him the actual chief investment officer of the pension fund of Philadelphia, and which is pretty remarkable is that um when he got the job the city pension fund was really in the dumps, it was not doing well, it was not performing well. Michael predicted Brexis [Brexit] and pulled the money out and saved the city within his first week like $12 million dollars, yeah so he predicted that. He was truly brilliant, remarkable. And ugh, the day that he died, he committed suicide, he actually went to work that day, gave a presentation in the morning about how they should [pause] the long term investment strategy so that the Pension Fund would improve, and recently the Chief Finance Officer, Rob Dubow, actually called my father and myself and said can you guys come into our office and meet with us, and we came in and we weren't expecting, you know, they probably wanted to talk about Michael and everything, and he slid a paper in front of us and it showed how the city's pension fund of Philadelphia is outperforming every other city's pension fund in like 2017, 2018, which is pretty remarkable. […]

257.    These statements only help demonstrate that Donatucci's claims had no basis in law or fact, nor could they.

258.    Donatucci and his son Donatucci, Jr. also waited an entire year to request Michael's medical records and even later turned down the Executrix's offer to obtain them initially.

259.    It is undeniable that Michael had testamentary capacity and that the Will Contest was a sham and at odds with the facts, filed by Donatucci only as an unfair tactic and to extort Meghan to accept his demands.

260.    Michael's probated Will, without question, indicates he had intelligent knowledge regarding the natural objects of his bounty (his mother and his fiancée), the property he possessed, and what he desired to be done with it.

261.    For the ordinary person, there would be no disputing this, but Donatucci refused to stand for it.  He didn't agree with Michael's Will and so he decided he could (and would) retaliate, including by make adjustments that were to his liking by whatever means necessary.

262.    Ultimately, faced with being held in contempt of an Orphans' Court's Order dated June 12, 2018 compelling him to cooperate with the Estate and to turn over property of the Estate and Meghan that he wrongfully took for himself and/or removed from Meghan and Michael's apartment, in a desperate attempt to avoid a further order of Judge Nagle against him (and in particular to avoid turning over Michael's phone and email passwords), Donatucci withdrew his baseless Will Contest on November 8, 2018. On December 13, 2018, Judge Nagle issued an order compelling Donatucci's compliance with the June 12 Order.

263.    However, contrary to what Donatucci may believe, withdrawing his Will Contest did not and does not rid him of his obligations to the Estate, as Judge Nagle agreed by his further Order, nor does it invalidate or diminish the years' worth of undue hardship and emotional distress he has inflicted upon Meghan in carrying out his scheme of intimidation and extortion, and exerting his power to take control of her interests and deprive her from carrying out her duties as Executrix and cause her harm.

264.    It is clear that Donatucci made no error in probating Michael's Will, but rather that he made a conscious and deliberate decision to probate the Will on August 11, 2016 with the forethought that he would be able to coerce Meghan to meet his demands.  His actions show that he never intended to see the Will Contest and Removal Petition through, and that he filed both for an improper goal of using them to extort and intimidate Meghan.

265.    The claims below are made under reservation of right to amend upon a complete investigation of Michael's cell phone and email accounts to which Donatucci and Mannion had

free and unfettered access for two and half years after Michael's death, and upon receipt and review of the copies of those items they took without right or approval of the Estate and Meghan. Donatucci and Mannion have refused and deprived Meghan of examining those copies to date, despite her numerous requests.

## COUNT I
## AGAINST DONATUCCI
### 42  U.S.C. § 1983 – Equal Protection – Class of One

266.     Plaintiffs incorporate all the above paragraphs as if fully set forth herein.

267.     In harassing, bullying, and intimidating Meghan and enlisting others beholden to him to harass, bully, and intimidate Meghan, Donatucci intentionally treated Meghan differently from others who are similarly situated, including others who come before the Register of Wills as Executors of decedents' estates.

268.     Donatucci's actions in intentionally singling out Meghan for intimidation and bullying were a perversion of his duties as Register of Wills and arbitrary and irrational.  There was no rational basis for the intentionally differential treatment.

269.     Donatucci and those answerable to him conspired and engaged in the scheme of intentional intimidation and bullying for vindictive and harassing purposes, and for the purpose of advancing Donatucci's own personal and financial interests in taking control of his late son's estate and obtaining for himself valuable real estate that his son had left to others, i.e., Meghan and his ex-wife, not to Donatucci.

270.     As alleged above, at relevant times Donatucci was acting under color of state law, by virtue of the extraordinary patronage empire he had built using his position as Register of Wills.

271.     Donatucci was motivated by illegitimate animus and ill-will against Meghan.

272.     As a result of the foregoing, Meghan has suffered and continues to suffer damages, including but not limited to severe emotional distress, fear, humiliation, ridicule, mental anguish, loss of enjoyment of life, and damage to her reputation.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Donatucci and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

**COUNT II**
**AGAINST DONATUCCI**
**42 U.S.C. § 1983 – Substantive Due Process, Egregious Abuse of Power**

273.     Plaintiffs incorporate all the above paragraphs as if fully set forth herein.

274.     Meghan has a property interest in the real property interests Michael bequeathed to her in his will.

275.     By interfering with and trying to seize control of the Estate's interests in the real property bequeathed to her for his personal benefit, through bullying and intimidation carried out personally by him and by those beholden to him by virtue of his nearly four decades of using his office to create a patronage empire, Donatucci violated Meghan's substantive due process rights.

276.     As a result of the foregoing, Meghan has suffered and continues to suffer damages, including but not limited to severe emotional distress, fear, humiliation, ridicule, mental anguish, loss of enjoyment of life, and damage to her reputation.

**WHEREFORE**, Plaintiffs respectfully requests that this Honorable Court enter judgment against Donatucci and award Plaintiffs compensatory, punitive damages, and consequential damages, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

**COUNT III**
**AGAINST ALL DEFENDANTS EXCEPT and REAL ESTATE ENTITIES**
**42 U.S.C. § 1985(3) – Civil Rights Conspiracy**

277.    Plaintiffs incorporate all the above paragraphs as if fully set forth herein.

278.    Donatucci Mannion, Stephanie Donatucci, Foglietta, Golden, DeSimone, and Donatucci, Jr., among others, engaged in a conspiracy for the purpose of depriving Meghan of her of equal protection of laws in serving in the role of Executrix of Michael's Estate.  Specifically, and among other things, Donatucci, Mannion, Stephanie Donatucci, Foglietta, Golden, DeSimone, and Donatucci, Jr. conspired to bring about Meghan's removal as Executrix on false and illegitimate grounds, so that Donatucci could take control of the Estate and wrest Meghan's valuable real property interests from her.  Other executrixes that come before the Register of Wills are not subjected to this arbitrary, vindictive, and intimidating treatment.

279.    Donatucci, Mannion, Stephanie Donatucci, Foglietta, Golden, DeSimone, and Donatucci, Jr., had an agreement that Foglietta would give up to Donatucci her share of her inheritance under Michael's will, in exchange for a monetary sum and for being allowed to live in one of the properties Donatucci controlled by virtue of his real estate ventures with their sons Michael and Donatucci, Jr.  By doing this, Donatucci would advance his goals of obtaining control of the Estate and ownership of its real estate.

280.    Donatucci, Mannion, Stephanie Donatucci, Foglietta, Golden, DeSimone, and Donatucci, Jr., committed multiple acts in furtherance of the conspiracy.  For example, Foglietta with the assistance of Golden, DeSimone, Mannion, and Donatucci, Jr. agreed to be enlisted by Donatucci to file the Removal Petition, and Donatucci and Mannion drafted the Petition to be filed in Foglietta's name, since Donatucci had no standing to file it in his own name.

281.    In addition Donatucci and WSFS Bank and its representatives, in particular Herb Matter, and WSFS's counsel, the Berger Law Group (including Phillip Berger and Matthew Kaufmann), and Brimfield/Siu and their counsel, Mulcahey, among others, working together by agreement, engaged in conduct to deprive Plaintiffs of their right to the Girard Avenue Property so that Donatucci could take control of the Property, among Michael's other valuable real estate interests, for the benefit of himself and Brimfield/Siu and the Bank. Other executrixes who come before the Register of Wills are not subjected to such interference as regards their contractual relations or such arbitrary, vindictive, and intimidating treatment.

282.    As a result of the foregoing, Meghan has suffered and continues to suffer damages, including but not limited to severe emotional distress, fear, humiliation, ridicule, mental anguish, loss of enjoyment of life, and damage to her reputation.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Donatucci, Mannion, Mannion Prior, Stephanie Donatucci, Foglietta, DeSimone, Donatucci, Jr., WSFS, Brimfield, and Siu, jointly and severally, and award Plaintiff compensatory, consequential, and punitive damages, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

### COUNT IV
### AGAINST ALL DEFENDANTS EXCEPT DONATUCCI JR., STEPHANIE DONATUCCI, and the REAL ESTATE ENTITIES
### Abuse of Process

283.    Plaintiffs incorporate all the above paragraphs as if fully set forth herein.

284.    Donatucci and Mannion used the Will Contest, and used and continue to use the Removal Petition litigation and/or the Chester County Action solely to falsely conjure up claims, collude, and leverage and carry out an extortion and intimidation scheme by which he improperly stymied and delayed the Estate's administration, deprived and hindered Meghan in carrying out

her duties, interfered with and/or have wrongly taken property of the Estate, failed to comply with rules of court and multiple court orders, and attempted to unfairly leverage and deliberately needlessly increased Plaintiffs' legal fees and costs to gain control of the Estate's valuable real estate.

285.   The above-described actions were taken by Donatucci, Mannion, and other Defendants, including Foglietta, DeSimone, WSFS, and Brimfield/Siu, knowingly and intentionally, working together by agreement, solely as a tactical weapon to coerce a result that is not the legitimate object of the legal process, including, but not limited to, unfairly delaying or prolonging the litigation process in order to improperly stymie and delay, unfairly leverage, needlessly increase Plaintiffs' legal fees and costs, put pressure upon Plaintiffs in order to compel them to accept their demands, and were intended to and in fact did cause harm to Plaintiffs.

286.   Such Defendants employed the use of court process and are continuing to do so through their pursuit of the Removal Petition and claims and averments in the Chester County Action as a tactical weapon to coerce a desired result that is/was not the legitimate object of the process.

287.   Plaintiffs have suffered, and continue to suffer, substantial damages and irreparable harm as a result of Donatucci's and such other Defendants' unlawful acts, as described above.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Donatucci, Mannion, Mannion Prior, Foglietta, DeSimone, Donatucci, Jr., WSFS, Brimfield, and Siu, jointly and severally, and award Plaintiffs compensatory, consequential, and punitive damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

## COUNT V
## AGAINST DONATUCCI, MANNION and MANNION PRIOR ("MANNION")
### Malicious Prosecution

288.    Plaintiffs incorporate all the above paragraphs as if fully set forth herein.

289.    This count is for wrongful use of civil process or proceedings and arises under common law and the Dragonetti Act, 42 Pa. C.S. § 8351 *et seq*.

290.    Defendants Donatucci, Mannion and Mannion Prior (as above, "Mannion") (who were involved in the probate process) knowingly and intentionally, working together by agreement, initiated a meritless appeal of Donatucci's judicial decision to admit Michael's Will to probate and issuance of letters testamentary to Meghan as Executrix of the Estate (i.e., the "Will Contest").

291.    The Will Contest terminated in favor of Plaintiff.

292.    Neither Donatucci nor Mannion were attempting to properly adjudicate their claims, and they did not answer the bell in the fight they started, which is a favorable determination for Plaintiffs.

293.    Defendants Donatucci and Mannion knew when Donatucci initiated, procured and continued such proceedings that the appeal was meritless or without probable cause and filed for improper purposes.

294.    Defendants Donatucci and Mannion, at all relevant times, acted in a grossly negligent manner and intended the claims for improper and wrongful purposes.

295.    Notwithstanding his knowledge that the claims were meritless, Donatucci and Mannion nonetheless procured, initiated and continued such civil proceedings against Plaintiffs.

296.     Donatucci and Mannion, at all relevant times, knew the Will Contest was without factual or legally cognizable basis, and was solely to falsely conjure up and leverage an extortion scheme.

297.     Donatucci and Mannion, at all relevant times, knew the Will Contest was baseless and was intended to, and in fact would cause harm to Plaintiffs, and no evidence to support those claims was ever introduced.

298.     Donatucci and Mannion filed the Will Contest solely to improperly stymie and delay the Estate's administration, deprive and hinder Meghan in carrying out her duties by exerting power and their will in effort to take control of the Estate, interfere with and/or wrongly take property of the Estate, and unfairly leverage and deliberately needlessly increased Plaintiffs' legal fees and costs to gain control of the Estate's valuable real estate.

299.     Donatucci and Mannion reasonably should have known there was no legally cognizable basis for the Will Contest.

300.     Donatucci and Mannion knew or should have known that the Will Contest they initiated, advanced and/or supported was a wrongful use of the civil process of the Orphans' Court and was being used and, in fact, was used, solely to falsely conjure up and leverage an extortion and intimidation scheme by which they improperly stymied and delayed the Estate's administration, deprived and hindered Meghan in carrying out her duties by exerting power and their will in effort to take control of the Estate, interfered with and/or wrongly took property of the Estate, and unfairly leveraged and deliberately needlessly increased Plaintiffs' legal fees and costs to gain control of the Estate's valuable real estate.

301.     Donatucci and Mannion procured, initiated and/or continued the Will Contest in the underlying litigation without reasonably believing in the existence of any facts upon which the

claims were based, solely for improper purposes of conjuring up and leveraging an extortion and intimidation scheme by which they improperly stymied and delayed the Estate's administration, deprived and hindered Meghan in carrying out her duties by exerting power and their will in effort to take control of the Estate, interfered with and/or wrongly took property of the Estate, and unfairly leveraged and deliberately needlessly increased Plaintiffs' legal fees and costs to gain control of the Estate's valuable real estate, in an attempt to force a deal for themselves.

302.    Donatucci and Mannion knew or should have known that the Will Contest they initiated, advanced and/or supported against Plaintiffs was primarily for a purpose other than that of securing proper discovery, joinder of parties, or adjudication of the claims.

303.    Donatucci and Mannion knew the Will Contest was groundless in fact and under existing or developing law, and was intended to merely harass and/or maliciously injure Plaintiffs.

304.    Donatucci and Mannion actively took part in the procurement, initiation and/or continuation of the Will Contest and related proceedings knowing they were for improper purposes – including, but not limited to, putting pressure upon Plaintiffs in order to compel them give up their rights under Michael's probated Will and/or solely to harass or maliciously injure Plaintiffs – by actively engaging in and supporting the Will Contest with, *inter alia*, the lack of slight diligence or care, conscious and with voluntary acts or omissions in reckless disregard of their legal duties and of the consequences to Plaintiffs, and want of even scant care, without exercising even that care which a careless person would use.

305.    Donatucci and Mannion, by actively taking part in the procurement, initiation and/or continuation of the Will Contest and related proceedings against Plaintiffs, acted in a grossly negligent manner, without probable cause, with malice, and primarily for a purpose other than that of securing proper discovery, joinder of parties, or adjudication of the Will Contest.

306.    The actions of Donatucci and Mannion described above are unlawful under 42 Pa.

C.S. § 8351 *et seq.*

307.    Plaintiffs has suffered, and continue to suffer, substantial damages and irreparable

harm as a result of the unlawful acts of Donatucci and Mannion, including, but not limited to, harm

resulting from the dispossession and/or interference with the advantageous use of Plaintiffs'

property and things, harm to Plaintiffs' reputation by defamatory matter alleged, emotional

distress, incurring attorneys' fees and expenses in connection with the underlying Will Contest

and related proceedings, other resulting pecuniary losses, and punitive damages.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment

against Donatucci, Mannion, and Mannion Prior, jointly and severally, and award Plaintiffs

compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs,

pre-judgment and post-judgment interest, damages recoverable pursuant to 42 Pa. C.S. § 8353,

and such other additional relief that this Honorable Court deems just and equitable.

**COUNT VI**
**AGAINST ALL DEFENDANTS EXCEPT THE REAL ESTATE ENTITIES**
**Intentional Infliction of Emotional Distress**

308.    Plaintiffs incorporate all the above paragraphs as if fully set forth herein.

309.    As described above in the Factual Allegations section of this Complaint, the

conduct of Defendants Donatucci, Mannion, Mannion Prior, Stephanie Donatucci, Foglietta,

DeSimone, WSFS, Brimfield/Siu, and Donatucci Jr. was extreme and outrageous; they acted with

an intent to cause Meghan severe emotional distress or with reckless disregard that such conduct

would cause severe emotional distress.

310.     Particularly in light of the circumstances of Michael's death, such Defendants' actions were so extreme in degree, as to go so beyond the bounds of decency that they give rise to a claim of intentional infliction of emotional distress.

311.     Also, in addition to his scheme, Donatucci's actions were most extreme and outrageous as to be regarded as atrocious and utterly intolerable in a civilized community in that he left his son for hours to be found by Meghan covered in blood, knowing that Michael had suffered a gunshot wound to his head and was dead, and selfishly and in reckless disregard of Meghan caused her to find Michael covered in blood in their apartment and as a result to suffer severe emotional distress.

312.     Meghan actually suffered extreme emotional distress as a result of Donatucci's and such other Defendants' actions, as set forth in the Factual Allegations above.

313.     Defendants are responsible to Meghan for all resulting permanent or other psychological harm, depression, anxiety, mental anguish and shock to her nerves and nervous system they have caused due to their actions.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants Donatucci, Mannion, Mannion Prior, Stephanie Donatucci, Foglietta, DeSimone, WSFS, Brimfield/Siu, and Donatucci Jr., jointly and severally, and award Plaintiff Meghan E. Klein compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

### COUNT VII
### AGAINST ALL DEFENDANTS EXCEPT THE REAL ESTATE ENTITIES
### Negligent Infliction of Emotional Distress

314.     Plaintiffs incorporate all the above paragraphs as if fully set forth herein.

315.     At relevant times, Defendants Donatucci, Donatucci, Jr., WSFS, Brimfield/Siu, and Foglietta, and through them, their respective counsel named as Defendants herein, owed or owe fiduciary or contractual duties to Plaintiffs by virtue of the Commonly-Held Realty Interests and/or the Defendant Real Estate Entities (including Ronald, Michael and Ronald, LP; Ronald and Robert Donatucci, LP; Penn Peak Capital, LLC; and RRM Associates, LLC).

316.     Particularly in light of the circumstances of Michael's death, such Defendants' actions and/or tortious conduct that is part of the scheme set forth above went so beyond the bounds of decency that they give rise to a claim of negligent infliction of emotional distress, including for fear of physical injury reasonably felt or experienced by Meghan due to the threats, intimidation and/or extortion that has been part of the scheme.

317.     Also, as a result of the negligence of Donatucci, Meghan discovered and witnessed Michael dead covered in blood in their apartment, and she has been caused to suffer extreme emotional and physical distress for which Donatucci is responsible.

318.     Donatucci's actions were also most extreme and outrageous as to be regarded as atrocious and utterly intolerable in a civilized community in that he left his son for hours to be found by Meghan covered in blood, knowing that Michael had suffered a gunshot wound to his head and was dead, and selfishly and in reckless disregard of Meghan caused her to find Michael covered in blood in their apartment and as a result to have been caused to suffer extreme emotional and physical distress for which Donatucci is responsible.

319.     Such Defendants are responsible to Meghan for any and all resulting permanent or other psychological harm, depression, anxiety, mental anguish and shock to her nerves and nervous system they have caused due to their actions.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants Donatucci, Mannion, Mannion Prior, Stephanie Donatucci, Foglietta, DeSimone, WSFS, Brimfield/Siu, and Donatucci Jr., jointly and severally, and award Plaintiff Meghan E. Klein compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

**COUNT VIII**
**AGAINST DONATUCCI, DONATUCCI, JR., AND STEPHANIE DONATUCCI**
**Conversion / Wrongful Appropriation / Theft / Embezzlement**

320.    Plaintiffs incorporate all the above paragraphs as if fully set forth herein.

321.    Donatucci, Donatucci, Jr., and Stephanie Donatucci have taken money and/or property belonging to Plaintiffs without right or justification and are continuing to withhold such items from Plaintiffs and refuse to turn them over to Plaintiffs.

322.    Despite demand for delivery of such money and property made by Plaintiffs and the court orders against Donatucci compelling the same, Donatucci, Donatucci, Jr., and Stephanie Donatucci have failed and refused to turn over such money and/or property to Plaintiffs.

323.    As a direct and proximate result of this conversion, wrongful appropriation, theft, and embezzlement of such money and/or property, Plaintiffs have suffered substantial damages, including but not limited to compensatory damages, consequential damages consisting of, among other things, attorneys' fees and costs.

324.    The actions of Donatucci, Donatucci, Jr., and Stephanie Donatucci have been willful and outrageous and undertaken with reckless indifference to the rights of Plaintiffs. Such conduct warrants an award to Plaintiffs of punitive or exemplary damages in an amount sufficient to punish Donatucci and deter similar wrongdoing by others.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Donatucci, Donatucci, Jr., and Stephanie Donatucci, jointly and severally, and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

**COUNT IX**
**AGAINST ALL DEFENDANTS EXCEPT THE REAL ESTATE ENTITIES**
**Conspiracy**
**(including to Commit Conversion/Theft and Intentional Infliction of Emotional Distress)**

325.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

326.    As set forth in Count VIII, Defendants Donatucci, Donatucci, Jr., and Stephanie Donatucci have engaged in conversion, wrongful appropriation, theft and embezzlement for which they are liable to Plaintiffs. The allegations of such count are incorporated by reference.

327.    As set forth in Count VI, Defendants Donatucci, Mannion, Mannion Prior, Stephanie Donatucci, Foglietta, DeSimone, WSFS, Brimfield/Siu, and Donatucci Jr. have engaged in conduct resulting in intentional infliction of emotional distress to Plaintiff Meghan Klein for which they are liable to her. The allegations of such count are incorporated by reference.

328.    Such Defendants have and continue to willfully participate in joint agreement and action to deprive Plaintiffs of their rights as Executrix and beneficiary of the Estate and to their property, and to cause and inflict emotional harm to Plaintiff Meghan Klein harm, as set forth above.

329.    Such Defendants have so acted in concert pursuant to an agreement to carry out such deprivation of rights and property and to cause Meghan such harm.

330.    Such Defendants conspired and acted together to scheme and carry out a common plan to extort and take money and property of Plaintiffs, including burdening Plaintiffs with legal

expenses and wear down Plaintiffs to hinder or prevent them from pursuing a proper partitioning of Michael's Commonly-Held Realty Interests, and coerce unfairly Plaintiffs to accept Donatucci's demands.

331.    Such Defendants knowingly and intentionally have and continue to scheme and worked together in their common plan against Plaintiffs for unlawful purposes for the benefit of themselves and to the detriment of Plaintiffs and causing Plaintiffs damages.

332.    As described above, Plaintiffs have and continue to suffer harm and injury, including intentional infliction of emotional distress, as set forth above, due the foregoing Defendants' conduct.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants Donatucci, Mannion, Mannion Prior, Stephanie Donatucci, Foglietta, DeSimone, WSFS, Brimfield/Siu, and Donatucci Jr., jointly and severally, and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

## COUNT X
## AGAINST DONATUCCI, DONATUCCI, JR., AND STEPHANIE DONATUCCI
### Trespass

333.    Plaintiffs incorporate all the above paragraphs as if fully set forth herein.

334.    Donatucci, individually or through his agents acting at his direction, Donatucci, Jr., and Stephanie Donatucci unlawfully entered Michael and Meghan's apartment, removed items or property from the apartment, and changed the locks on the apartment, without Plaintiffs' consent.

335.    As a direct and proximate result of this trespass, Plaintiffs have suffered substantial damages, including but not limited to compensatory damages, consequential damages consisting of, among other things, attorneys' fees and costs.

336.    The actions of Donatucci, Donatucci, Jr., and Stephanie Donatucci have been willful and outrageous and undertaken with reckless indifference to Plaintiffs' rights. Such conduct warrants an award to Plaintiffs of punitive or exemplary damages in an amount sufficient to punish Donatucci, Donatucci, Jr., and Stephanie Donatucci and deter similar wrongdoing by them and others in the future.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Donatucci, Donatucci, Jr., and Stephanie Donatucci, jointly and severally, and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

## COUNT XI
### AGAINST DONATUCCI, DONATUCCI, JR., RRM ASSOCIATES, LLC, RONALD, MICHAEL AND RONALD, LP, AND RONALD AND ROBERT DONATUCCI, LP
#### Partition

337.    Plaintiffs incorporate all the above paragraphs as if fully set forth herein.

338.    The Pennsylvania Rules of Civil Procedure provide that any co-tenant owning real estate with other co-tenants may bring an action for partition of the property.  Pa. R. Civ. P. 1551 et seq. (the "Partition Rules").

339.    Pa. R. Civ. P. 1551 provides that "the procedure in an action for the partition of real estate shall be in accordance with the rules relating to the civil action."

340.    Pa. R. Civ. P. 1553 provides that "[a]n action for partition may be brought by any one or more co-tenants."  "All other co-tenants shall be joined as defendants." Pa. R. Civ. P. 1553.

341.    The Partition Rules provide that such actions "may be brought in and only in a county in which all or any part of any property which is the subject matter of the action is located." Pa. R. Civ. P. 1552. "The complaint shall include (a) a description of the property and (b) a statement of the nature and extent of the interest of each party in the property." Pa. R. Civ. P. 1552.

342.    Pa. R. Civ. P. 1555 provides that "[t]he plaintiff may state in the complaint causes of action for the partition of all or any part of any properties in which the plaintiff and the defendants are co-tenants, irrespective of their location in the Commonwealth or of the proportion of the plaintiff's interest in the several properties."

343.    Michael, together with his father, Donatucci, and brother, Donatucci Jr., was co-tenant of numerous real estate properties in Philadelphia, individually as co-tenants, as well as through a limited liability company, RRM Associates, LLC, and two limited partnerships, Ronald, Michael and Ronald, LP and Ronald and Robert Donatucci, LP.

344.    For purposes of Pa. R. Civ. P. 1552, below is a description of each property and a statement and nature of the extent of the interest of each party in the property:

| **Address of Property:** | **Title Owner:** |
| --- | --- |
| 4537 Spruce Street | Tenants in common (Michael, Donatucci Sr. and Donatucci Jr.) |
| 1425 Spruce Street | Tenants in common (Michael, Donatucci Sr. and Donatucci Jr.) |
| 1179-81 S. 13th Street | Tenants in common (Michael, Donatucci Sr. and Donatucci Jr.) |
| 1541 S. 13th Street | Tenants in common (Michael, Donatucci Sr. and Donatucci Jr.) |
| 2249 S. 21st Street | Tenants in common (Michael, Donatucci Sr. and Donatucci Jr.) |
| 1615-17 Porter Street | *Ronald Michael and Ronald, LP* |

| | |
|---|---|
| 1907 S. Broad Street | Tenants in common (Michael, Donatucci Sr. and Donatucci Jr.) |
| 1402 E. Moyamensing Avenue | ***RRM Associates, LLC*** |
| 1030-32 Colorado Street | ***RRM Associates, LLC*** |
| 1214 Annin Street | Tenant in common (Michael, Donatucci Sr. and Donatucci Jr.), or ***Ronald and Robert Donatucci, LP*** |
| 1507-09 E. Moyamensing Avenue, Units A-C | ***RRM Associates, LLC*** |

The description of each aforementioned property is set forth in each property's deed.  The deeds for these properties are attached to this complaint as **"Exhibit I"**.

345.    Plaintiffs have property interests in the real estate listed above which are not in dispute.

346.    Plaintiffs have been wrongfully excluded from the aforementioned properties, including by barring Plaintiffs from entering the aforementioned properties, reviewing any books or records relating to ownership of such books and records, or receiving any rents or other distributions owed to Plaintiffs, as a result of their ownership in the aforementioned properties.

347.    As a result of Defendants' actions in wrongfully excluding Plaintiffs from the aforementioned actions, it is no longer practicable for the parties to continue in co-ownership of these properties.

348.    Defendant Ronald, Michael and Ronald, LP is a limited partnership with its principal place of business in Philadelphia, PA.  At the time of Michael's death, its Limited Partners were Donatucci Sr. (33%), Michael (33%), and Donatucci Jr. (33%).  Its General Partner is Donatucci Sr. (1%).

349.    Defendant RRM Associates, LLC is a limited liability company with its principal place of business in Philadelphia, PA.  At the time of Michael's death, its Members were Donatucci

Sr. (34%), Michael (33%), and Donatucci Jr. (33%). The managing member of RRM Associates, LLC is Donatucci.

350.    Defendant Ronald and Robert Donatucci, LP is a limited partnership with its principal place of business in Philadelphia, PA. Plaintiffs have not been provided information regarding the percentage interests of the limited partners of this limited partnership.

351.    Meghan, individually and as Executrix of the Estate of Michael P. Donatucci, brings this cause of action for partition and sale of the aforementioned properties owned in part by Michael, as the rightful beneficiary and/or Executrix of such ownership interests, whether as tenant in common, member of RRM Associates, LLC, limited partner in Ronald, Michael Ronald, LP, or limited partner in Ronald and Robert Donatucci, LP.

**WHEREFORE**, Plaintiffs demand judgment in her favor and against such Defendants, either (i) dividing the aforementioned properties among the parties, pursuant to Pa. R. Civ. P. 1560, in accordance with the parties' ownership in the properties; or alternatively (ii) ordering the sale of the aforementioned properties pursuant to Pa. R. Civ. P. 1563 and distributing the proceeds of such sales in accordance with the parties' ownership in the properties. Plaintiffs further demand Plaintiffs' share of the rental value of the properties, as well as an accounting of rents, profits or other benefits received by the other co-tenants due and owing to Plaintiffs, as well as any liabilities purportedly incurred by Plaintiffs arising out of Plaintiffs' ownership interest in the properties.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand trial by jury of twelve as to all claims that may be tried to a jury.

Respectfully submitted,

**SCHLAM STONE & DOLAN, LLP**

Date:   July 22, 2019                              By:        _/s/ Jeffrey M. Eilender_____
                                                              Jeffrey M. Eilender, Esq.
                                                                 *Admitted Pro Hac Vice*
                                                              Elizabeth Wolstein, Esq.
                                                                 *Pro Hac Vice Application Pending*
                                                              Joshua Wurtzel, Esq.
                                                                 *Admitted Pro Hac Vice*
                                                              26 Broadway
                                                              New York, NY 10004
                                                              Tel. 212-344-5400
                                                              Fax 212-344-7677
                                                              Email: jeilender@schlamstone.com;
                                                              ewolstein@schlamstone.com;
                                                              jwurtzel@schlamstone.com
                                                              Lead Counsel for Plaintiffs, Meghan E.
                                                              Klein, Individually and as Executrix of the
                                                              Estate of Michael Philip Thomas Donatucci,
                                                              Deceased

                                                                      and

                                                              **BERKOWITZ KLEIN, LLP**

Date:   July 22, 2019                              By:        _/s/ Robert A. Klein_____
                                                              Robert A. Klein, Esq.
                                                              Pa. Attorney I.D. No. 44670
                                                              629 B Swedesford Road
                                                              Swedesford Corporate Center
                                                              Malvern, PA 19355-1530
                                                              Tel. 610-889-3200
                                                              Fax 610-889-9564
                                                              Email: rak@berklein.com
                                                              Local Counsel for Plaintiffs, Meghan E.
                                                              Klein, Individually and as Executrix of the
                                                              Estate of Michael Philip Thomas Donatucci,
                                                              Deceased